717 S.E.2d 765

**Tony L. POPE and Lynn S. Pope, Individually and Representing as a Class all Unit Owners for Riverwalk at Arrowhead Country Club Horizontal Property Regime, Respondents,**

v.

**HERITAGE COMMUNITIES, INC., Heritage Riverwalk, Inc., and BuildStar Corporation, Appellants,**

**Riverwalk at Arrowhead Country Club Property Owner's Association, Inc., Respondent,**

v.

**Heritage Communities, Inc., Heritage Riverwalk, Inc., and BuildStar Corporation, Appellants.**

No. 4888.

Court of Appeals of South Carolina.

Heard June 15, 2011.
Decided Sept. 14, 2011.
Rehearing Denied Dec. 12, 2011.

408

C. Mitchell Brown, William C. Wood, Jr., A. Mattison Bogan, and Michael J. Anzelmo, all of Columbia; and William L. Howard, Stephen L. Brown, and Russell G. Hines, all of Charleston, for Appellants.

John P. Henry and Philip C. Thompson, both of Conway, for Respondents.

SHORT, J.

Heritage Communities, Inc. (HCI), Heritage Riverwalk, Inc. (HRI), and BuildStar Corporation (collectively, Appellants) appeal the jury's verdicts in these consolidated construction defect actions. We affirm.

## FACTS

Construction on Riverwalk Development (Riverwalk), a condominium complex in Horry County, began in June 1997 and was completed in December 1999. Riverwalk included 228 units in 19 buildings. HCI was the parent corporation of both HRI (the developer and seller), and BuildStar (the general contractor supervising all construction). Prior to and simultaneously with the construction, Appellants developed numerous other properties in Horry County, South Carolina.[1] HCI turned management of Riverwalk over to the Riverwalk at Arrowhead Country Club Property Owners' Association, Inc. (the POA) in September 2002.

The POA filed an action against Appellants alleging defects in the construction of Riverwalk. Condominium owners Tony and Lynn Pope (the Popes) also filed an action against Appel-

---

1. Appellants also developed a property in Charlotte, North Carolina.

lants, on their own behalf and on behalf of the owners of Riverwalk, seeking to recover damages for the loss of use of their property during the estimated repair period. By order filed September 3, 2008, the Honorable Benjamin Culbertson certified the Popes and all other unit owners as a class (the Class). The Class and POA actions were consolidated for trial.

The POA and the Class (collectively, Respondents) alleged numerous causes of action including (1) negligence against HCI, HRI, and BuildStar; (2) breach of express warranty against HCI; (3) breach of the warranty of habitability against HRI; (4) breach of the warranty of workmanlike service against BuildStar; and (5) breach of fiduciary duty against HCI and HRI.

The case went to trial on January 5, 2009, before the Honorable Clifton Newman. After the close of Respondents' evidence, the trial court directed a verdict for HCI on the express warranty cause of action and for BuildStar on the warranty of workmanlike service cause of action. At the close of all evidence, the trial court granted Respondents' motions for directed verdicts on the negligence claims. The jury returned a verdict in favor of the POA for $4.25 million in actual damages and $250,000 in punitive damages. The jury awarded the Class $250,000 in actual damages and $750,000 in punitive damages. This appeal followed.

## ISSUES ON APPEAL

I. Did the trial court err in its instructions to the jury?

II. Did the trial court err by ruling Appellants were amalgamated in interests?

III. Did the trial court err by failing to decertify the Class?

IV. Did the trial court err by admitting expert testimony as to loss of use damages?

V. Did the trial court err by admitting evidence of subsequent remedial measures?

VI. Did the trial court err by admitting evidence of construction defects at other HCI developments?

VII. Did the trial court err by granting Respondents' motions for directed verdict on the negligence claims?

VIII. Did the trial court err by denying Appellants' motions for directed verdict and judgment notwithstanding the verdict (JNOV)?

IX. Did the trial court err by permitting the punitive damages awards?

## STANDARD OF REVIEW

"The standard of review for an appeal of an action at law tried by a jury is restricted to corrections of errors of law. A factual finding of the jury will not be disturbed unless there is no evidence which reasonably supports the findings of the jury." *Felder v. K–Mart Corp.*, 297 S.C. 446, 448, 377 S.E.2d 332, 333 (1989).

## LAW/ANALYSIS

### I. Jury Instructions

Appellants argue the trial court erred in its instructions to the jury. We find no reversible error.

### a. Willfulness, Wantonness, and Recklessness in Defining Negligence

Appellants maintain the trial court erred in charging the jury by including the standard of willful, wanton, and reckless conduct in the definition of simple negligence, which effectively required the jury to find the recklessness necessary to award punitive damages.

In instructing the jury, the court charged:

Now, [Respondents] allege that [Appellants] negligently constructed the Riverwalk Condominiums. Negligence is the failure to exercise the degree of care which a person or entity of ordinary reason and prudence would exercise under the same or similar circumstances as exist[ ] in this case. Carelessness and negligence mean[ ] the same thing.

To establish negligent construction[,] [Respondents] must prove four essential elements. One, that there was an undertaking to construct a building by [Appellants; two] that [Appellants] **were negligent or careless or reckless,**

**willful and wanton** in the performance of that construction work, or stated another way, that they did not perform the work in a good and workman[-]like manner.

Three, **that the negligence or carelessness or reckless-ness, willfulness and wantonness** of [Appellants] in performing that construction work was a proximate cause of any damages sustained by [Respondents].

And four, the resulting damages must be shown.

Negligence is not actionable unless it proximately causes [Respondents'] damages....

(emphasis added).

Later in the charge, the court addressed punitive damages: Punitive damages can only be awarded where [Respondents] prove by clear and convincing evidence that [Appellants'] actions were willful, wanton, malicious and in reckless disregard of [Respondents'] rights or where [Appellants'] actions were so grossly negligent as to imply a willfulness or wantonness. A conscious failure to exercise due care constitutes willfulness....

. . . .

[Respondents] cannot recover punitive damages based on negligent conduct. Negligence is the doing of some act which a person of ordinary prudence would not have done under similar circumstances.... Mere negligence will not support a punitive damages award. To recover punitive damages [Respondents] must prove by clear and convincing evidence that [Appellants'] actions were willful, wanton or reckless or so grossly negligent as to imply a willfulness or wantonness.

The word[s] recklessness, willfulness[,] and wantonness are synonymous. The terms are used to describe a conscious failure to exercise and observe reasonable or due care. Recklessness is distinguished from negligence. Negligence is the failure to use due care. Negligence is carelessness, as mentioned earlier. Negligence is a failure by omission or commission to exercise due care as a person of ordinary reason and prudence would exercise in the same circumstances. **Recklessness is a higher degree of culpability and responsibility. Recklessness signifies a conscious failure to exercise due care. Recklessness is a**

**conscious indifference to the rights of [Respondents] or a reckless disregard of the rights of [Respondents]. Recklessness is an awareness of wrongful conduct and continuation to act regardless of consequences.**

Gross negligence is the intentional conscious failure to do something which is incumbent upon one to do or the doing of a thing intentionally that one ought not to do. Negligence is the failure to exercise due care, while gross negligence is the failure to exercise even the slightest care. . . .

(emphasis added).

Appellants argue the instruction, combined with the grant of directed verdicts to Respondents on negligence, suggested to the jury the court had already determined that Appellants were willful, wanton, and reckless. We find no reversible error.

■■ In reviewing an alleged error in jury instructions, we are mindful that an appellate court will not reverse the trial court's decision absent an abuse of discretion. *See Cole v. Raut,* 378 S.C. 398, 404, 663 S.E.2d 30, 33 (2008) (applying an abuse of discretion standard of review to an alleged error in jury instructions). Furthermore, an appellate court will review the charge as a whole. *See Keaton ex rel. Foster v. Greenville Hosp. Sys.,* 334 S.C. 488, 497, 514 S.E.2d 570, 575 (1999) (finding a jury charge should be reviewed as a whole, and if the charges are reasonably free from error, isolated portions that might be misleading do not constitute reversible error). Here, although the trial court's initial language in instructing the jury on negligence may have been a misstatement of law, the court then extensively defined willful, wanton, and reckless conduct and instructed the jury on the difference between mere negligence and willful, wanton, and reckless conduct. In reading the charge in its entirety, we find no prejudice to Appellants. *See Priest v. Scott,* 266 S.C. 321, 324, 223 S.E.2d 36, 38 (1976) (finding an alleged error in a jury charge must be prejudicial to warrant a new trial).

#### b. Mandatory Award of Damages

■ Appellants also argue the trial court's jury charge was erroneous because it required the jury to award actual damages on the negligence claims. Appellants argue the charge

inappropriately conveyed to the jury that the directed verdicts on negligence extended to proximate cause and should only have conveyed the court's determination of duty and breach.[2] We find no reversible error.

During opening arguments, Appellants conceded that construction defects existed at Riverwalk, and repairs needed to be made. Appellants' counsel stated: "[W]e ask you [the jury] to render a true verdict in this case, which would be the cost of repairs that we submit to you through our expert ... the true cost of the repairs in this case, which will be around 2.3, 2.391 million dollars."

At the close of evidence, the court directed verdicts on the negligence claim. As to the POA's claim, the trial court instructed the jury:

> I charge you that as a matter of law I have determined that [Appellants] were negligent in the construction of these condominiums. As a result **you must award** [the POA] damages for the cost of repairs and other costs ... **to the extent these damages have been proven** by a preponderance of the evidence.

(emphasis added).

The trial court is required to charge only the current and correct law of South Carolina. *Clark v. Cantrell*, 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000). In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial. *Welch v. Epstein*, 342 S.C. 279, 311, 536 S.E.2d 408, 425 (Ct.App.2000). If the charges are reasonably free from error, isolated portions that might be misleading do not constitute reversible error. *Keaton*, 334 S.C. at 497–98, 514 S.E.2d at 575. A jury charge that is substantially correct and covers the law does not require reversal. *Id.* at 496, 514 S.E.2d at 574.

---

2. "To establish a negligence cause of action under South Carolina law, the plaintiff must prove the following three elements: (1) a duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty." *J.T. Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 369–70, 635 S.E.2d 97, 101 (2006).

■ In reading the charge in its entirety, we find no error based on the evidence at trial and the court's directed verdict on the POA's negligence claim. Ordinarily, proximate cause is a question for the jury, and the trial court's jury charge in a negligence action should include instruction on this element of negligence. *See McKnight v. S.C. Dep't of Corr.*, 385 S.C. 380, 387, 684 S.E.2d 566, 569 (Ct.App.2009) (stating proximate cause is ordinarily a question for the jury); *see also Clark*, 339 S.C. at 390, 529 S.E.2d at 539 (finding a trial court must charge the current and correct law). However, when the evidence is susceptible to only one inference, proximate cause is a matter of law for the court. *McKnight*, 385 S.C. at 387, 684 S.E.2d at 569.

In this case, the trial court granted a directed verdict in the POA action on duty, breach, and proximate cause. The dispute at trial was the amount of the damages. Therefore, the court correctly charged the jury it must award damages to the extent they were proven. *See Hinds v. Elms*, 358 S.C. 581, 584–86, 595 S.E.2d 855, 857–58 (Ct.App.2004) (suggesting when liability is established in a negligence action, including proximate cause, the plaintiff is entitled to an award of damages unless proof completely fails); *Baker v. Weaver*, 279 S.C. 479, 482, 309 S.E.2d 770, 771 (Ct.App.1983) (stating instructions to the jury should be confined to the issues at trial). We find no reversible error in these jury instructions.

Finally, as to Appellants' argument that the trial court erred in instructing the jury as to damages on the Class's negligence claim, we find no error. During the jury charge conference, Appellants argued the directed verdict on the proximate cause element of negligence applied only to the POA's construction defect claim, and it did not apply to the Class's loss of use claim. Agreeing with Appellants, the trial court stated: "I'm clearly not going to tell them they must award damages on the loss of use. They may find there were no damages, no loss of use. . . ." The court charged: "As to the class action lawsuit . . . you must determine the nature and extent of any damages suffered by the unit owners for the loss of use of the condominiums during any repairs." We find these instructions do not require the jury to award damages, as Appellants argued. *See Stewart v. Richland Mem'l Hosp.*, 350 S.C. 589, 595, 567 S.E.2d 510, 513 (Ct.App.2002) (stating a

jury charge that is substantially correct does not require reversal).

## II. Amalgamation of Interests

Appellants argue the trial court erred in finding the separate corporate entities, HCI, HRI, and BuildStar, were amalgamated. We disagree.

Gwyn Hardister,[3] the chief operating officer and president of HCI, testified about the management of and interplay between the corporate entities. Hardister testified HCI was the parent corporation of HRI and BuildStar. HRI provided off-site management of Riverwalk, sold the condominium units, and owned title to the property. BuildStar was the general contractor acting as an oversight management group, and it supervised the construction of Riverwalk. Hardister testified Roger Van Wie was his boss, a corporate officer, and a board member. Although HCI, HRI, and BuildStar were separate corporations, they had the same board members, and all were managed and controlled by Van Wie. According to Hardister, Riverwalk did not have any employees; all employees of HCI, HRI, and BuildStar reported to Van Wie; the delineation of employees between the separate corporations was vague; and the three companies shared offices. Hardister acknowledged construction problems to the homeowners and represented that HCI would repair the problems. Furthermore, the warranty manual distributed to the homeowners upon purchase was entitled: "Heritage Communities, Inc. Limited Warranty Manual" and identified HCI as the corporation extending the warranty.

Lynn Anderson, an HCI employee, testified she was the vice president of finance and accounting for HCI and eventually became the president of BuildStar. Anderson paid the bills for all three corporations. She testified the three corporations shared the same officers, directors, office, and telephone number.

The trial court found the corporate entities were amalgamated, stating: "[T]he legal distinction[s] between the entities are blurred, ... they are in effect one and the same as far as

---

**3.** Mr. Hardister is identified in the record as Quinn Hardister, but identified by Respondents as Gwyn Hardister.

their representation and operation and that the actions of one should apply to the others ... because they are in effect one and the same . . . . "

 Appellants first argue the trial court erred by not employing a "piercing the corporate veil" analysis.[4] We find this issue is not preserved for appellate review.

At trial, Appellants' argument regarding piercing the corporate veil was as to Van Wie, not as to the separate corporations. Counsel for Appellants stated: "I raised earlier on this afternoon [Respondents] want to basically try Roger Van Wie and when they do that, what they are essentially asking the Court to do is to pierce a corporate vail [sic] without ever having any elements and without ever actually bringing any testimony to try to say it is all Roger Van Wie."

We find the issue raised on appeal, that the trial court erred in neglecting to find the elements necessary to pierce the corporate veil, is not preserved. *See* Jean Hoefer Toal, Shahin Vafai & Robert A. Muckenfuss, *Appellate Practice in South Carolina* 65 (2nd ed. 2002) ("The objection must be sufficiently specific to bring into focus the precise nature of the alleged error so that it can be reasonably understood by the trial judge."). In this case, the earlier discussion referred to by Appellants' counsel related to objections to testimony that impugned Van Wie's character. In our view, the objection was not sufficiently specific to inform the trial court that Appellants wanted it to consider the theory of piercing the corporate veil, rather than the amalgamation of interests theory, as between the three corporate entities.

Appellants also argue application of the amalgamation of interests theory, like piercing the corporate veil, requires a finding of fraud, wrong, or fundamental unfairness. At trial, Appellants argued the three corporations were separate entities and sharing office space was not sufficient for the court to find an amalgamation of interests. Appellants did not argue

4. South Carolina employs a "two prong test for piercing the corporate veil. The first prong analyzes the shareholder's relationship to the corporation by evaluating eight factors. The second prong requires the plaintiff to demonstrate that 'fundamental unfairness' would result from recognition of the corporate entity." *Drury Dev. Corp. v. Found. Ins. Co.*, 380 S.C. 97, 102, 668 S.E.2d 798, 800 (2008).

the trial court needed to find fraud, wrong, or fundamental unfairness. Thus, this issue is not preserved. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) (stating an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review).

Appellants finally argue the trial court erred in finding these corporations were amalgamated in interests. We disagree.

In *Kincaid v. Landing Development Corp.*, 289 S.C. 89, 91, 344 S.E.2d 869, 871 (Ct.App.1986), three related corporations (a development corporation, a management corporation, and a construction corporation) were sued for negligent construction and breach of warranty. The management corporation argued the court should have directed a verdict in its favor because it was merely the marketing and sales company. *Id.* at 96, 344 S.E.2d at 874. In addition to sharing owners, the three companies shared a location. *Id.* Furthermore, the management company was the corporation called to remedy problems. *Id.* Finally, the company's letterhead identified the management company as "A Development, Construction, Sales, and Property Management Company." *Id.* This court affirmed the trial court's finding that the evidence revealed "an amalgamation of corporate interests, entities, and activities so as to blur the legal distinction between the corporations and their activities." *Id.* (quoting the trial court); *see Mid–South Mgmt. Co. v. Sherwood Dev. Corp.*, 374 S.C. 588, 597–605, 649 S.E.2d 135, 140–44 (Ct.App.2007) (discussing *Kincaid* as one of three theories raised for holding a parent corporation liable in place of a subsidiary: (1) piercing the corporate veil; (2) alter-ego or instrumentality theory; and (3) the amalgamation of interests or blurred identity theory).

 In this case, we find similar indicia of an amalgamation of interests between HCI, HRI, and BuildStar. The corporations shared a location, telephone number, and board members. Also, the record contains evidence the delineation of employees between them was vague. In addition, HCI held itself out to the homeowners as the corporation responsible for construction defects in its warranty and through Hardister's representations to the homeowners. In our view, evidence

supports the trial court's finding of an amalgamation of interests between HCI, HRI, and BuildStar.

## III. Decertification of the Class

Appellants argue the trial court erred in denying their motion to decertify the Class because it failed to meet the requirements of commonality and typicality. We disagree.

Prior to the consolidation of these two actions, the Class was certified by order of Judge Culbertson. The Class sought damages for the loss of use of their condominiums for the period of time Respondents' expert testified all units would have to be vacated. Citing the five prerequisites of class certification found in Rule 23(a) of the South Carolina Rules of Civil Procedure, Judge Culbertson made these findings: (1) the Class consisted of 228 condominium owners and was so numerous that joinder of all members was impracticable; (2) there were questions of law or fact common to the Class because they all alleged they would suffer loss of use during the remediation period necessary to repair the construction defects; (3) the claims of the representative parties were identical to the claims of the other members of the Class; (4) the representative parties would fairly and adequately protect the interests of the Class; and (5) the amount in controversy exceeded $100 per member of the Class.

At trial, Appellants moved to decertify the Class. Appellants argued the class representatives, the Popes, were absentee homeowners who rarely utilized their unit; therefore, they did not represent the Class. Appellants also argued the Class was not common because members sustained differing amounts of damage to their units, and members utilized their units in different manners, including permanent residency, full or part-time rentals, and vacation homes. The trial court denied the motion, finding Appellants' primary argument, that the Class lacked the commonality required by Rule 23(a)(2) because the use of the units differed, was not an issue of commonality as much as an issue to be addressed by the parties' respective experts as to the amount of loss of use damages.

Tony Pope, a class representative, testified he owned a unit at Riverwalk and was the treasurer of the POA. Pope used his

unit as a second home, did not rent it, and believed he was entitled to compensation for the period of time the unit would be unavailable to him while Riverwalk was being restored. Albert Best, qualified as an expert in the field of estimating reconstruction and rehabilitation projects, testified he is a general contractor and owner of a construction company that specializes in restoration of houses in South Carolina with water intrusion damage. Best testified the reconstruction of Riverwalk would require the homeowners to move out of the development for four months.

Francis DeSantis,[5] qualified as an expert in loss of use damages, testified he estimated the damages for loss of use by the number of units, the size and number of bedrooms per unit, and comparable rental rates in the area. DeSantis testified all owners, regardless of how each utilized his or her unit, were uniformly affected. DeSantis explained he considered loss of use based on habitability, not on occupancy. Thus, according to DeSantis, an owner who was a permanent resident and had to move out suffered the same loss of use damages as an owner who used the unit as a second home and could not use it.

It is within a trial court's discretion whether a class should be certified. *Tilley v. Pacesetter Corp.*, 333 S.C. 33, 42, 508 S.E.2d 16, 21 (1998). The party seeking certification is required to prove the following five elements:

1) the class must be "so numerous that joinder of all members is impracticable;" 2) there must be "questions of law or fact common to the class;" 3) the "claims or defenses of the representative parties [must be] typical of the claims or defenses of the class;" 4) "the representative parties [must] fairly and adequately protect the interests of the class;" and 5) "the amount in controversy [must] exceed[ ] one hundred dollars for each member of the class."

*Gardner v. S.C. Dep't of Revenue*, 353 S.C. 1, 20–21, 577 S.E.2d 190, 200 (2003) (alterations by court) (quoting Rule 23(a), SCRCP). The failure to satisfy any one of the prerequisites is fatal to class certification. *Id.* at 21, 577 S.E.2d at 200. "The first four criteria are often referred to as the require-

---

5. Mr. DeSantis is identified in the record as Francis DeSentes, but identified by Respondents as Francis DeSantis.

ments for numerosity, commonality, typicality and adequacy of representation." *Id.*

To establish commonality, a party must show "questions of law or fact common to the class." Rule 23(a)(2), SCRCP. Commonality does not require every issue in the case to be common to all class members. *Gardner,* 353 S.C. at 21, 577 S.E.2d at 200–01. Rather, commonality is met when the class shares a determinative issue. *Id.* We find the Class shares the determinative issue of loss of use. We also find the fact that the Class members utilized their units in different manners does not defeat the commonality prerequisite. *See McGann v. Mungo,* 287 S.C. 561, 568, 340 S.E.2d 154, 157–58 (Ct.App.1986) (discussing the commonality requirement of Rule 23 and stating it is not necessary that all questions of law and fact be common, only that common issues exist among the class).

■ To establish the typicality requirement, the "claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Rule 23(a)(3). In *King v. American General Finance, Inc.,* 386 S.C. 82, 91, 687 S.E.2d 321, 325 (2009), our supreme court reversed the trial court's order decertifying the class. The trial court decertified the class, finding no typicality in a class action against a lender for failing to timely provide statutorily-mandated attorney preference disclosure forms. *Id.* at 87, 687 S.E.2d at 323. The trial court based its decision on the differing times of when the class members' loans attached to property. *Id.* The supreme court reversed, finding the common feature satisfying typicality was the lender's failure to timely provide the form. *Id.* at 91, 687 S.E.2d at 325. In this case, the representatives claimed damages arising from construction defects and loss of use. The record contains evidence that all unit owners, regardless of the manner of their use, would be excluded from the property for four months. We find the representatives' claims were typical of the claims of the other class members.

## IV. Expert Evidence of Loss of Use Damages

Appellants argue the trial court erred in denying their motion to exclude the testimony of Respondents' expert on loss of use damages because the unit owners were in different

positions vis-à-vis the use of their units. Appellants argued the expert's theory, that a non-permanent resident was entitled to the same loss of use damages as a permanent resident, was flawed. Appellants also objected to qualifying the witness as an expert. We find no reversible error.

Francis DeSantis testified he has an undergraduate degree in mechanical engineering and did graduate work in engineering and business. For the last fifteen years, he has owned a real estate and rental broker's company in Horry County. DeSantis has been a licensed real estate broker in South Carolina for fourteen years. He testified that approximately ninety-eight percent of his company's revenue derives from the rental business.

Beginning in 2002, DeSantis began making loss of use and loss of profit calculations, performing studies to place a financial value on rental rates needed to replace a condominium for a period of time. DeSantis performs competitive analyses of rental rates, market trends, demand levels, occupancy rates, and rental prices in the area. His company focuses primarily on single-family homes and condominiums. DeSantis testified he has acted as a consultant for numerous clients, including a bank and many homeowners' associations. DeSantis was formerly qualified as an expert in loss of use damages in South Carolina in 2006. DeSantis admitted he had not published any studies and was not an economist or accountant. The trial court qualified DeSantis as an expert in loss of use damages.

The qualification of an expert witness and the admissibility of his or her opinion are matters within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion and a showing of prejudice. *Manning v. City of Columbia,* 297 S.C. 451, 453–54, 377 S.E.2d 335, 337 (1989); *McDill v. Mark's Auto Sales, Inc.,* 367 S.C. 486, 490, 626 S.E.2d 52, 55 (Ct.App.2006).

Expert testimony is subject to the reliability requirements of Rule 702, SCRE. *Watson v. Ford Motor Co.,* 389 S.C. 434, 445, 699 S.E.2d 169, 175 (2010). Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge,

skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, SCRE. Rule 702 applies to both scientific and nonscientific evidence. *State v. White,* 382 S.C. 265, 274, 676 S.E.2d 684, 689 (2009). In *White,* the supreme court reiterated that whether an expert's testimony is scientific or nonscientific, the trial court has a gatekeeping role with respect to all evidence sought to be admitted under Rule 702. *Id.* As a gatekeeper, "[t]he trial court must examine the substance of the testimony to determine if it is reliable, regardless of whether the expert evidence is scientific, technical, or other specialized knowledge." *Watson,* 389 S.C. at 449, 699 S.E.2d at 177.

 Regarding Appellants' contention that the trial court abused its discretion in qualifying DeSantis as an expert, we find no error. DeSantis has significant background knowledge of the condominium rental market in the area, and he has performed other studies of loss of use based on rental and occupancy rates. Furthermore, he has been performing loss of use analyses for more than five years, including testifying as an expert in loss of use. We find no error by the trial court in qualifying DeSantis as an expert in loss of use damages.

Appellants also argue the trial court erred in admitting the expert testimony because the methodology was flawed by concluding homeowners that were not permanent residents suffered loss of use damages. DeSantis testified he estimated the damages for loss of use by the number of units, the size and number of bedrooms per unit, and comparable rental rates in the area. DeSantis included loss of use for all owners, regardless of how each owner utilized his or her unit, opining the owners were uniformly affected regardless of their use. Thus, according to DeSantis, an owner who was a permanent resident and had to move out suffered the same loss of use damages as an owner that used the unit as a second home and could not use it. DeSantis explained he applied the lowest monthly rate, rather than the seasonal weekly rate, to determine the total loss of use damages. DeSantis testified the total loss of damages suffered was $928,215.[6]

---

6. Appellants' expert on loss of use damages, Jesse Teel, Jr., testified loss of use damages varied among condominium owners depending on use. Teel calculated total loss of use damages at $227,041.

We find no abuse of discretion by the trial court in admitting this testimony. In considering the evidence, the court recognized Appellants' argument to exclude the testimony was based on a belief that the damages suffered by each type of owner were different. The trial court found the basis of Appellants' attack on DeSantis was the believability, rather than the admissibility, of his testimony. The court noted the different methodologies used by the parties' experts. Appellants' expert analyzed loss of use by separating the owners into certain categories of homeowners. DeSantis analyzed loss of use as common among the different types of homeowners. The trial court found both methodologies to be appropriate measures of loss of use.

In sum, the trial court examined the matter pretrial, listened to extensive voir dire on DeSantis' qualifications and experience in calculating loss of use damages, and admitted the testimony. Based on our review of the record, we find the trial court adequately performed the gatekeeper function. *See Watson*, 389 S.C. at 449, 699 S.E.2d at 177 (stating the trial court, as the gatekeeper, must examine the substance of the testimony to determine if it is reliable).[7]

## V. Evidence of Subsequent Remedial Measures

Appellants argue the trial court erred in admitting a letter from BuildStar to the manufacturer of the windows used in constructing Riverwalk, that asked the manufacturer to replace 192 defective windows. Appellants maintain the admission violated Rule 407, SCRE, regarding evidence of subsequent measures.[8] We find this issue is not preserved for appellate review.

---

7. To the extent Appellants argue the trial court failed to specifically state it found the evidence reliable, we find the issue is not preserved because it was not raised to or ruled upon by the trial court. *See Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) (noting that issues not raised to or ruled upon by the trial court are not preserved for appellate review).

8. Rule 407 governs the admissibility of subsequent remedial measures and provides: "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence. . . ." Rule 407, SCRE.

Jim Graham testified he worked for a window manufacturer at the time Riverwalk was constructed. Graham was called in 1997 or 1998 by one of his company's distributors regarding water intrusion problems with the windows at HCI developments. During his testimony, Appellants objected to references regarding other HCI developments; Graham's ability to testify as to the cause of the water intrusion without qualifying as an expert; Graham's inability to authenticate the letter; Graham's bias due to settlement offers; and hearsay. Respondents introduced the letter from BuildStar during Graham's testimony. Appellants' counsel objected, "[s]ubject to the prior objection...." Appellants never raised the issue of the inadmissibility of the exhibit based on a violation of the rule governing subsequent remedial measures. Because this issue was neither raised to nor ruled upon by the trial court, it is not preserved for appellate review. *See Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) (noting that issues not raised to or ruled upon by the trial court are not preserved for appellate review); *Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) (noting the grounds for an objection must be specifically stated to preserve an issue for appellate review).

## VI. Evidence of Defects at Other Developments

Appellants argue the trial court erred in admitting evidence of defects at other HCI developments. We disagree.

Numerous times throughout the trial, Appellants objected to or moved to exclude evidence of construction defects at other HCI developments. The trial court admitted the evidence.

Rule 404(b) of the South Carolina Rules of Evidence governs this issue: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b), SCRE. In *Whaley v. CSX Transportation, Inc.*, 362 S.C. 456, 483, 609 S.E.2d 286, 300 (2005), our supreme court recognized that similar acts are admissible if they tend to prove or disprove some fact in dispute. *See Branham v. Ford Motor Co.*, 390 S.C. 203, 230, 701 S.E.2d 5, 19 (2010) (discussing *Whaley* ). Evidence of similar acts has the potential to be

exceedingly prejudicial. *Branham,* 390 S.C. at 230, 701 S.E.2d at 19. Accordingly, a plaintiff must present facts showing the other acts were substantially similar to the event at issue. *Whaley,* 362 S.C. at 483, 609 S.E.2d at 300. Other acts may be admissible for purposes of establishing the facts necessary to prove entitlement to punitive damages. *Judy v. Judy,* 384 S.C. 634, 642–43, 682 S.E.2d 836, 840–41 (Ct.App. 2009), *aff'd on other grounds,* 393 S.C. 160, 712 S.E.2d 408 (2011) (affirming when the trial court admitted evidence of a similar prior lawsuit). The admission of evidence is within the trial court's discretion, and the trial court's decision will not be reversed on appeal absent an abuse of discretion. *Whaley,* 362 S.C. at 483, 609 S.E.2d at 300 (applying the abuse of discretion standard of review to the admissibility of evidence of similar accidents).

Jennifer Harmon, an employee of Noble Company, testified at trial. Noble Company specialized in property management of homeowners' associations and was hired in 1999 to manage the POA. At the time, Roger Van Wie, Gwyn Hardister, and Lynn Anderson were on the Board of Directors. Harmon testified the Board requested a building condition assessment report, which was prepared in October 1999. The report noted numerous construction defects at Riverwalk, including moisture intrusion around the windows, doors, and breezeway ceilings; gaps in the brick facade; and water damage on porches.

Harmon testified Noble Company managed four other HCI developments, and they had experienced similar construction defect problems. Harmon admitted HCI had been given copies of building assessment reports on the other developments, similar to the one prepared for Riverwalk, indicating comparable problems.

Thomas Pegram, an architect, was hired to develop plans for Riverwalk. Pegram testified he used the same basic plans at Riverwalk that were used at the other HCI developments. Graham, the window manufacturer, testified he was investigating problems with windows at several HCI developments. Hardister, HCI's president, testified other HCI developments had problems with leaks at or near the windows, and were also involved in construction litigation. Anderson, HCI's vice pres-

ident of finance and accounting and president of BuildStar, testified to involvement in litigation involving three of the other HCI developments. Franklin Drew Brown, qualified as Respondents' expert in contracting and building forensics, testified to numerous defects at Riverwalk. Brown testified he had been hired to investigate three other HCI developments and found similar deficiencies. Steve Watkins, qualified as Appellants' unlimited general contractor expert, testified he had been involved in "four or five" HCI development cases. Jesse Teel, Appellants' loss of use expert, testified he had performed a loss of use analysis on another HCI development. Alan Campbell, Appellants' engineering and construction defect expert, testified to the scope of work necessary to repair Riverwalk. Campbell testified he had prepared reports on the scope of work at other HCI developments.

After a review of the record, we find the construction defects at the other HCI developments were substantially similar to those experienced by Riverwalk. Many of the experts were involved in all of the HCI developments that were experiencing the same water intrusion problems and subsequent litigation. The HCI employees were likewise involved in the litigation of several of the developments. Brown testified the deficiencies at the various developments were the same, including the use of identical inappropriate trim. Graham testified he became involved when the issue with the windows was first reported in 1997 or 1998, prior to the completion of Riverwalk, and the same windows and installation occurred at Riverwalk. We find significant similarities between the construction defects alleged in this case and the defects testified about at the other developments.

 We also find the evidence was admissible to prove several of the elements required for a punitive damages award, as argued by Respondents at trial. *See Gamble v. Stevenson*, 305 S.C. 104, 111–12, 406 S.E.2d 350, 354 (1991) (listing the factors to consider in conducting a review of punitive damages as (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) existence of similar past conduct; (5) likelihood of deterring the defendant or others from similar conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and

(8) other factors deemed appropriate). The evidence was relevant to the elements of the duration of the conduct, Appellants' awareness, and similar past conduct. For instance, Graham's testimony of the discovery regarding moisture intrusion around the windows indicated knowledge as early as 1997 or 1998, and also indicated the duration of the conduct. Harmon testified HCI had received building assessment reports on other developments, indicating the duration of the conduct and similar past conduct. Viewing the testimony as a whole, we find no error by the trial court in admitting evidence of defects at the other developments.

## VII. Directed Verdict on Respondents' Negligence Claims

Appellants argue the trial court erred in granting Respondents' motions for directed verdicts as to the negligence claims. We disagree.

During opening arguments, counsel for Appellants stated:

Ladies and gentlemen of the jury, the real issue in this case is what is it going to cost to fix condominiums out at Riverwalk, and that is the central issue and what we deny ... is that the costs out at Riverwalk are going to cost over 8.6 million dollars.... We submit that the cost estimates that we will put before you are the real and true costs for fixing the issues out there at Riverwalk.

You will hear us say repeatedly during this case we're not running from these issues, we acknowledge there are issues out there at Riverwalk. We acknowledge there are certain repairs that need to be made but they do not fall anywhere near the class of repairs that these plaintiffs are going to ask for in this case....

. . . .

[W]e ask you to render a true verdict in this case, which would be the cost of repairs that we submit to you through our expert ... the true cost of the repairs in this case, which will be around 2.3, 2.391 million dollars.

The trial court granted Appellants' motions for directed verdicts on the negligence claims, finding:

[I]t [is] clear that [the] condominiums were negligently constructed, and that is based on the testimony as well as

the representation of counsel. It would not be proper to allow counsel to represent to the jury that [Appellants are] responsible and intend[ ] to engage in repairs on the one hand and on the other hand argue as a matter of law they are not responsible. More importantly than that, the witnesses all acknowledge defects in the construction....

Appellants argue they did not concede liability on the negligence claim, but merely acknowledged the existence of the defects. In response to Respondents' motion for directed verdicts on negligence, counsel for Appellants argued:

As to the negligence issue, Your Honor, I certainly got up there in opening and being nothing but frank with the jury acknowledged there were issues out there at Riverwalk and laying out the damages in an opening statement how the case will progress.... [O]ur defect experts and our estimator have identified that there [are] $2,391,619 in deficiencies out there and that what I said to the jury was what are the real issues and what is it going to really cost to fix it, and I gave them that number.

Now, to say that means you automatically have bought into that, I don't believe it is fair under the pleadings.... [W]e pled both affirmatively that there are third parties ... responsibl[e]....

■ We find no error by the trial court in granting a directed verdict on negligence based on Appellants' concession at trial. We find the concession of counsel in this case similar to that in *Collins v. Bisson Moving & Storage, Inc.*, 332 S.C. 290, 504 S.E.2d 347 (Ct.App.1998). In *Collins*, the plaintiff was injured in a car accident, and while being transported to the hospital in an ambulance, was further injured when a truck collided with the ambulance. *Id.* at 292, 504 S.E.2d at 348. This court found the defendant's concessions during opening statements were concessions of liability and proximate cause. *Id.* at 303, 504 S.E.2d at 354–55 (concluding defendant's statements that the plaintiff's injuries were primarily caused by the first accident and the plaintiff would fail to prove the damages were primarily caused in the second accident, was a concession supporting a directed verdict of liability and proximate cause); *see Hall v. Benefit Ass'n of Ry. Emps.*, 164 S.C. 80, 83, 161 S.E. 867, 868 (1932) ("The parties to a suit

are bound by admissions, made by their attorneys of record, in open court, or elsewhere, touching matters looking to the progress of the trial.").

Based on the evidence, we also affirm the trial court's grant of directed verdicts on the negligence claims. Appellants argue the case was about numerous distinctive defects, and even if Appellants' witnesses acknowledged the existence of defects, they did not acknowledge all defects alleged by Respondents. Viewing the trial in its entirety, the issue in this case was the extent of damages. The primary witnesses testified to conflicting estimates of the extent of the damages. The experts of both Appellants and Respondents testified to detailed defects in the construction of Riverwalk. The reports differed primarily in the scope of work necessary to repair the defects and the cost of the repairs.

Franklin Brown, Respondents' expert, testified to the construction defects at Riverwalk. Brown found numerous defects: (1) inadequate site drainage; (2) nonexistent or improperly installed sealant; (3) gaps in the cladding system, siding, and trim; (4) inadequate brick lintel support at the windows; (5) improperly installed brick veneer; (6) missing flashing above windows; (7) deck membrane improperly terminated or compromised by the use of posts or screws on the balconies and decks; (8) no control joints installed in balcony ceilings; (9) inadequate attic access to one unit; (10) water damage to exterior trim; (11) water damage to interiors; and (12) water damage to wall sheathings. Brown testified that in his expert opinion, the industry standard of care in constructing Riverwalk was breached. Brown provided a report indicating the scope of work necessary to repair Riverwalk. Respondents' expert, Albert Best, estimated it would cost $8,662,147 to make the repairs described in Brown's scope of work report. He estimated the job would take three years to complete.

Alan Campbell, Appellants' expert, acknowledged many construction defects, code violations, and violations of industry standards. He provided his own scope of work report for the defects he determined needed to be corrected. Appellants' expert, Steve Watkins, testified it would cost $2,391,619 to repair the construction defects in Campbell's report.

Harmon, an employee of Riverwalk's property manager, also testified to the defects. Harmon testified about the building condition assessment report and Appellants' knowledge of the defects. Harmon also admitted HCI knowingly turned the homeowners' associations over to the homeowners with knowledge of the construction deficiencies and without the funds to make the necessary repairs. Harmon testified Hardister addressed the homeowners at a March 15, 2000 association meeting, admitted HCI was aware of construction problems, and assured the homeowners HCI intended to correct the problems.

Hardister also acknowledged the construction problems. He admitted he was aware of the construction deficiencies, HCI was still selling the condominiums with this knowledge, and the problems were not corrected at the time of the insolvency and closing of the corporations. Hardister admitted the POA was entitled to have repairs made.

In ruling on motions for directed verdict, the trial court must view the evidence and the inferences reasonably drawn therefrom in the light most favorable to the party opposing the motions and deny the motions if the evidence yields more than one inference or its inference is in doubt. *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 434, 629 S.E.2d 642, 648 (2006). The trial court should deny the motions when either the evidence yields more than one inference or its inference is in doubt. *McMillan v. Oconee Mem'l Hosp., Inc.*, 367 S.C. 559, 564, 626 S.E.2d 884, 886 (2006). "However, this rule does not authorize submission of speculative, theoretical, and hypothetical views to the jury." *Proctor v. Dep't of Health & Envtl. Control*, 368 S.C. 279, 292–93, 628 S.E.2d 496, 503 (Ct.App. 2006).

As this court did in *Collins*, we find the trial court's grant of a directed verdict affirmable based either on the concessions made at trial or based on the evidence. 332 S.C. at 303, 504 S.E.2d at 354. As the trial court in this case determined, we find the issue for the jury regarding the extent of the defects was a question of damages rather than liability or proximate cause.

Appellants also argue the trial court erred in granting a directed verdict on the negligence claims because BuildStar,

as the general contractor, was not responsible for the work performed by the subcontractors. Although a general contractor is not automatically responsible for the negligence of a subcontractor, a builder who undertakes to supervise the construction of a building is under the duty to exercise reasonable care. *See Fields v. J. Haynes Waters Builders, Inc.*, 376 S.C. 545, 561, 658 S.E.2d 80, 88–89 (2008) (rejecting the argument that a general contractor is automatically responsible for the negligence of a subcontractor, but approving jury instructions that included the law imposing a duty to use due care on a general contractor who supervises a subcontractor). Here, Pegram testified that a part of an architect's job is construction administration. After plans are completed, an architect performing construction administration reviews the shop drawings of the contractors and subcontractors, checks the material to be used, and visits the job site on a daily or weekly basis to insure the construction follows the plans. Pegram testified Van Wie would not permit his firm to conduct the contract administration at Riverwalk. Pegram was not prohibited from contract administration on any previous or subsequent jobs. Pegram warned Van Wie of the serious nature of the lack of contract administration and insisted on including a notice on the plans that Pegram's company was not permitted to inspect construction, and therefore, it was to be held harmless for construction defects. Finally, Lynn Anderson testified BuildStar was supervising the subcontractors at Riverwalk. We find no error in the trial court's grant of a directed verdict on Respondents' negligence claims.

## VIII. Denial of Directed Verdict and JNOV

Appellants argue the trial court erred in denying their motions for directed verdict and JNOV. Appellants maintain damages were speculative. Appellants also argue they were entitled to directed verdicts because no individualized determinations were made as to the standards of care applicable respectively to HCI, HRI, and BuildStar, and clear and convincing proof of entitlement to punitive damages from each Appellant was not established. We affirm the trial court's denial of Appellants' motions for directed verdict and JNOV.

Respondents' expert, Albert Best, acknowledged there were hidden damages in water intrusion construction defect pro-

jects. Best testified he determined the amount of hidden damage by comparing it to other buildings his company had repaired with similar construction. He testified that hidden damage in condominium projects ranged from ten to thirty percent of the contract, and he included ten percent in his estimate to repair Riverwalk. Appellants' expert, Steve Watkins, also acknowledged his estimate of damages included numerous allowances and contingencies for hidden damage.

■■■ When reviewing the denial of a motion for directed verdict or JNOV, the appellate court applies the same standard as the trial court. *Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 27–28, 602 S.E.2d 772, 782 (2004). The court is required to view the evidence and inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *Sabb v. S.C. State Univ.*, 350 S.C. 416, 427, 567 S.E.2d 231, 236 (2002). An appellate court will only reverse the trial court's ruling when no evidence supports the ruling or when the ruling is controlled by an error of law. *Steinke v. S.C. Dep't of Labor, Licensing & Regulation*, 336 S.C. 373, 386, 520 S.E.2d 142, 148 (1999).

■ To recover damages, the evidence must enable the jury to determine the amount of damages with reasonable certainty or accuracy. *Whisenant v. James Island Corp.*, 277 S.C. 10, 13, 281 S.E.2d 794, 796 (1981). The existence, causation, and amount of damages cannot be left to conjecture, guess, or speculation. *Id.* However, proof with mathematical certainty of the amount of loss or damage is not required. *Id.* The determination of damages may depend to some extent on the consideration of contingent events if a reasonable basis of computation is afforded, permitting a reasonably close estimate of the loss. *Piggy Park Enters., Inc. v. Schofield*, 251 S.C. 385, 391–92, 162 S.E.2d 705, 708 (1968).

■ We find a sufficiently reasonable basis of computation of damages in the record to support the trial court's submission of the issue of damages to the jury. *See May v. Hopkinson*, 289 S.C. 549, 559, 347 S.E.2d 508, 514 (Ct.App.1986) (affirming the award of damages based on the contractor's repair estimate even though the exact repairs needed could not be determined because the removal of defective wood was expected to reveal additional problems).

Appellants also argue Respondents failed to establish that each Appellant violated its respective standard of care, and that the jury's award of punitive damages was not based on individualized determinations that clear and convincing evidence supported such damages against each Appellant. Because we found the trial court did not err in finding Appellants amalgamated in interests, we decline to address this issue. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not address an issue when a decision on a prior issue is dispositive).

## IX. Punitive Damages

Appellants finally argue the punitive damages awards in both actions were improper because (1) the jury was permitted to award punitive damages to non-parties (other HCI developments) and (2) the punitive damages awards were inconsistent with the guidelines established in *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350 (1991). We find no error.

### a. Non-parties

Appellants argue the trial court's erroneous admission of evidence of defects at other Heritage developments resulted in the jury's imposition of punitive damages to non-parties. Because we found the trial court did not err in admitting evidence of defects at other HCI developments, we need not address this issue. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not address an issue when a decision on a prior issue is dispositive).

### b. *Gamble v. Stevenson*

Appellants argue that several of the factors used to review a punitive damages award weigh in their favor. In particular, Appellants argue the award of punitive damages has no deterrent effect because Appellants went out of business prior to the commencement of this litigation, and Appellants have no ability to pay punitive damages.

In *Gamble v. Stevenson,* 305 S.C. 104, 111–12, 406 S.E.2d 350, 354 (1991), the supreme court listed the factors the

trial court should consider in reviewing a punitive damages award: (1) the defendant's degree of culpability; (2) the duration of the conduct; (3) the defendant's awareness or concealment; (4) the existence of similar past conduct; (5) the likelihood that the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) the defendant's ability to pay; and (8) other factors deemed appropriate. Specific factual findings as to each factor are not required. *McGee v. Bruce Hosp. Sys.*, 321 S.C. 340, 346, 468 S.E.2d 633, 637 (1996) (finding although evidence of ability to pay is a factor in reviewing a punitive damages award, it is not a prerequisite).[9]

The trial court conducted a post-trial review of the punitive damages award using the factors outlined in *Gamble* and properly set forth its findings on the record. As to Appellants' degree of culpability, the trial court found relevant Appellants' experts' admission of code and industry standard violations. The trial court also noted the relevancy of Appellants' admissions of selling defective condominiums. As to the factors of the duration of the conduct and Appellants' awareness, the trial court noted the sales of defective condominiums continued for several years, and Appellants admitted they were aware of the construction deficiencies. The trial court noted the admission of similar conduct in other developments in reviewing the factor of similar past conduct. The court also found the award reasonably related to the costs and losses the POA and the Class will incur as a result of the defective condominiums. Finally, the court noted that although Appellants were no longer in business, the award would deter others from similar conduct, and the Appellants' inability to pay was not a requirement before the jury was justified in awarding punitive damages. We find no error by the trial court in the findings made under *Gamble*.

---

9. Appellants do not argue the amount of the punitive damages award violates constitutional guidelines. *See Mitchell, Jr. v. Fortis Ins. Co.*, 385 S.C. 570, 582–83, 686 S.E.2d 176, 182 (2009) (changing the standard of review of the constitutionality of a punitive damages award to de novo and mandating a review of the constitutionality of a punitive damages award).

## CONCLUSION

Based on the foregoing, the jury's verdicts are **AFFIRMED.**

KONDUROS and GEATHERS, JJ., concur.