0823

Michael E. WARD, Administrator of the Estate of Evelyn Player Ward, deceased, Respondent v. Anne C. EPTING, M.D., Appellant.

(351 S. E. (2d) 867)

Court of Appeals

*Barnwell, Whaley, Patterson & Helms*, Charleston, *for appellant.*

*Ellis I. Kahn* and *Cody W. Smith, Jr., Solomon, Kahn, Smith & Baumil*, Charleston, *for respondent.*

Heard Sept. 15, 1986.

Decided Dec. 1, 1986.

CURETON, Judge:

Michael E. Ward commenced this wrongful death action as Administrator of the Estate of Evelyn Ward against Dr.

Anne C. Epting. The jury returned a verdict against Dr. Epting for $400,000.00 actual damages. Dr. Epting appeals. We affirm.

Evelyn Ward, a twenty-two year old mother of a ten week old son, entered Baker Hospital on October 5, 1983 to have a saggital split osteotomy for a congenital jaw defect. Dr. Epting, Chief of Anesthesia at Baker, was Mrs. Ward's anesthesiologist. Dr. Epting obtained a medical history from Mrs. Ward on the evening prior to the surgery. Dr. Epting testified that, except for a history of asthma as a child, and a hiatal hernia, Mrs. Ward presented no potential difficulty under anesthesia. Dr. James Ingrassia, an oral surgeon, operated on Mrs. Ward for approximately three hours on the morning of October 6. Mrs. Ward experienced no difficulties during the surgery. Dr. Epting used an endotracheal tube during the surgery to assist Mrs. Ward's respiration. An endotracheal tube is inserted through the nostril down into the trachea, or windpipe. A nasal tube was necessary to enable Dr. Ingrassia to work unobstructed on Mrs. Ward's jaw.

Upon completion of surgery around eleven o'clock, Dr. Epting awoke Mrs. Ward and removed the tube. She testified Mrs. Ward was breathing on her own and was alert enough to respond to directions. Mrs. Ward was taken to the recovery room at 11:05. At 11:06 she began experiencing respiratory problems and turned blue, which is evidence of cyanosis. Cyanosis is a blue or purplish discoloration of the skin due to deficient oxygenation of the blood. Dr. Epting testified Mrs. Ward was having a laryngospasm, which she described as having "closed off the entrance to the windpipe." Mrs. Ward did not respond when Dr. Epting attempted to give her oxygen with a face mask and ambu bag. Dr. Epting estimated she pumped approximately a gallon of air into Mrs. Ward's stomach through the esophagus, since the oxygen could not pass through an apparent obstruction in her trachea.

Dr. Epting then entubated Mrs. Ward with a endotracheal tube. She testified Mrs. Ward responded to this attempt and very shortly began to breathe on her own; however, she soon became cyanotic again. Dr. Epting repositioned the tube and ordered drugs to dilate the bronchi of the lungs. These

attempts helped briefly, according to Dr. Epting. Mrs. Ward, however, continued to have difficulty. At approximately 11:30 Dr. Epting used a bronchoscope to check the position of the endotracheal tube and to check for obstruction of the tube.[1] Dr. Epting and a respiratory therapist both testified they saw the rings and the carina of the trachea. The carina is the point of bifurcation of the trachea into the left and right lungs.

Mrs. Ward's condition continued to deteriorate. A "mayday" was declared in the recovery room. CPR was administered to her at approximately 11:40. At 11:40 Dr. Epting cut the wires holding Mrs. Ward's jaw shut and viewed the tube's position using a laryngoscope.[2] A blood gas study[3] taken at that time showed profound inadequacy of oxygen. At that point Mrs. Ward's pupils were fixed and dilated, incicating severe brain damage. At approximately noon, a portable x-ray was taken. Resuscitation attempts continued until 12:45, at which point Mrs. Ward was declared dead.

The x-ray and autopsy revealed the endotracheal tube inserted into Mrs. Ward at the beginning of her respiratory problem was actually in her esophagus, not in the trachea. The cause of death was "Hypoxia or lack of oxygen due to edema of the upper airway and inadequate artificial ventilation." The pathologist testified Dr. Epting was "rather surprised" to learn the tube was in the esophagus. Apparently the x-ray had not been studied until after Mrs. Ward's death. Dr. Epting maintains the tube dislodged from the trachea between 11:45, when she checked its position using a laryngoscope, and noon, when the x-ray was taken. Dr. Epting suggests the tube was dislodged during resuscitation attempts or when Mrs. Ward was lifted up for the x-ray. She testified there was no clinical indication that the tube had been in the esophagus until the x-ray was taken. In Dr. Epting's opinion, Mrs. Ward died as a result of a severe

---

[1] A bronchoscope is a fiber-optic device which is inserted through the endotracheal tube to examine the interior of the airway.

[2] A laryngoscope is an instrument used to examine the interior of the larynx. It provides a more accurate examination of the placement of the endotracheal tube.

[3] A blood gas study shows the amount of oxygenation or ventilation taking place in the body.

asthmatic attack manifesting itself in bronchospasm, which is constriction of the airway below the point where artificial ventilation can be supplied.

Mr. Ward alleges Dr. Epting negligently failed to establish an adequate airway, failed to ascertain the airway had not been adequately established, and failed to use proper methods of resuscitation. Mr. Ward prayed for actual damages and costs under the South Carolina Wrongful Death Act. The case was tried from March 18-26, 1985, with a verdict of $400,000.00 actual damages. The numerous issues on appeal will be discussed separately.

I.

Dr. Epting first argues the lower court erred in allowing cross-examination of Dr. Epting by referring to opinions of a doctor who was not called as a witness and whose deposition was not introduced into evidence.

Dr. Ray Ivester, a local anesthesiologist, was consulted by Dr. Epting's insurer and, after the suit was filed, by her attorney. Dr. Ivester reviewed the medical records and spoke briefly with Dr. Epting. Dr. Epting listed Dr. Ivester on Answers to Interrogatories as a potential expert witness. When Mr. Ward served notice of taking Dr. Ivester's deposition, Dr. Epting moved for a protective order, arguing Dr. Ivester was consulted in anticipation of litigation, would probably not be called as a witness at trial, and the information he had received was privileged work product. The court denied the motion and allowed the deposition to proceed. At trial, Dr. Epting announced Dr. Ivester would not be called as a witness.

On cross-examination of Dr. Epting, Mr. Ward's counsel elicited the fact that Dr. Epting had read Dr. Ivester's deposition to prepare for trial of the case, and she regarded him as a respected physician. Counsel then proceeded to ask Dr. Epting: "Do you agree with Dr. Ivester. . . ." Dr. Epting's counsel objected at this point. The court held the objection was premature and instructed Mr. Ward's counsel to finish asking the question. Dr. Epting's counsel then attempted to explain to the court that he objected to the use of Dr. Ivester's deposition to actually publish his opinions to the jury through the pretense of cross-examining Dr. Epting.

The court refused to stop this manner of questioning, stating "His question was completely proper." The judge did, however, sustain Dr. Epting's objections to two subsequent questions based on Dr. Ivester's deposition where the objections were stated *after* the questions were asked.

Dr. Epting argues the judge erred in allowing Mr. Ward to question her by the use of deposition testimony of an expert who had not testified in court, and from a deposition that was not in evidence. Dr. Epting points out that the deposition, furthermore, could not have been placed in evidence because it was not admissible under provisions of Circuit Court Rule 87(D).[4] We note, however, that Dr. Epting does not argue in her brief that Dr. Ivester's deposition was hearsay.

On appeal, Dr. Epting also asserts error in the use of Dr. Ivester's deposition during cross-examination, because he was merely an informal consultant. This ground was not specifically asserted at trial. Where the record does not reflect that a point has been raised before the trial court, that point cannot be considered on appeal. *Murphy v. Hagan*, 275 S. C. 334, 271 S. E. (2d) 311 (1980).

The manner and extent of cross-examination is within the broad discretion of the trial judge, whose discretion must be exercised so that the trial is unaffected by prejudice. *Howle v. PYA/Monarch, Inc.*, 288 S. C. 586, 344 S. E. (2d) 157 (Ct. App. 1986). The statement of the case revealed Dr. Epting had consulted with Dr. Ivester regarding this lawsuit. Dr. Epting testified on cross-examination that she had read his deposition and regarded him as a respected physician. Inquiry may be made into the reasons for her opinion, the methods by which she arrived at her conclusions and the difference between her opinions and those of other experts. 31 Am. Jur. (2d) *Expert and Opinion*

---

[4] The parties stipulated the deposition was taken pursuant to Rule 87, for the purposes allowed therein. Rule 87(D) allows use of depositions at trial where: (1) it is used to impeach a witness; (2) it is the deposition of a party; (3) the witness is dead; or more than one hundred miles from the place of trial, unless the absence was procured by the party offering the deposition; the witness is imprisoned or infirm; or his presence cannot be procured by subpoena; or under exceptional circumstances in the interest of justice; and (4) if any party offers a part of a deposition, the other party may require it introduced in its entirety if the testimony is relevant to the part introduced.

*Evidence* Section 48 (1967). Moreover, the record discloses testimony of other experts that could have formed the basis for the hypothetical questions that would have elicited the same opinions from Dr. Epting as were obtained by use of Dr. Ivester's deposition. The objectionable questions are as follows.[5]

Dr. Epting was first asked if she agreed with Dr. Ivester that if the first blood gas was accurate, then bicarbonate should have been given. Dr. Jeffries and Dr. Crystal, Mr. Ward's experts, testified Dr. Epting's failure to administer sodium bicarbonate upon receiving the results of the first arterial blood gas was a breach of the standard of care. Dr. Epting's expert, on cross-examination, admitted he "might" have administered sodium bicarbonate.

Secondly, Dr. Epting was asked if she agreed with Dr. Ivester that he would have cut the wires holding her jaw shut early in the resuscitation attempts. Dr. Crystal and Dr. Jeffries testified the wires should have been cut to establish a proper airway at approximately 11:25, following the result of the first blood gas test, or when, after one or two attempts to pass the endotracheal tube, Mrs. Ward's condition failed to improve.

Third, Dr. Epting was asked if she agreed with Dr. Ivester that a bronchospasm would be relieved by hypoxia.[6] Dr. Jeffries testified that if a bronchospasm had occurred, in time her heart would stop beating from the effects of the hypoxia and the spasm would relax. At that point the patient could be ventilated and the heartbeat reestablished. He testified bronchospasm was a "clinical anesthesia garbage-pail diagnosis."

It is therefore apparent the record contains evidence which independently supports the hypotheses stated through the use of Dr. Ivester's deposition testimony. If it was error to allow questions based on the deposition, the error is harmless. *Martin v. Floyd*, 285 S. C. 229, 328 S. E. (2d) 637 (1985). We reject this argument.

---

[5] No motion was made to strike any of the questions, not even the two questions to which the trial judge sustained objections.

[6] Hypoxia is a condition of a deficiency of oxygen reaching the tissues of the body.

## II.

Dr. Epting alleges the court erred in permitting Mr. Ward to depose and elicit expert opinions from Dr. Ivester, an expert informally consulted by Dr. Epting. Dr. Epting voluntarily revealed Dr. Ivester's name to Mr. Ward. Upon receiving a notice to take Dr. Ivester's deposition, Dr. Epting filed a motion for a protective order asserting the opinions held by Dr. Ivester fall under the work product privilege. The judge allowed the deposition, but specifically instructed the expert could not be asked: (1) any facts supplied by counsel or the insurer; and (2) questions on any suggestions or discussions with respect to a trial strategy for Dr. Epting.

Dr. Epting asserts that allowing Dr. Ivester's deposition to be taken has a chilling effect on a party's right to informally consult with a medical expert concerning a medical malpractice case. Primarily, however, Dr. Epting declares she was prejudiced by the use which Mr. Ward made of the deposition in cross-examining her at trial.

We have previously examined this issue and held that the questions posed to Dr. Epting did not constitute prejudicial error since the record contained other evidence to support the assumptions stated in the questions. We similarly find here, that even if error were committed in allowing Ward to depose Dr. Ivester, no prejudice has been shown to justify reversal on this issue.

## III.

Dr. Epting argues the court erred in admitting evidence that she had twice failed to become a board-certified specialist in anesthesiology. She moved *in limine* for an order preventing any reference at trial of her failure to achieve certification. The court refused the motion, holding failure of certification was proper for jury consideration. The order noted "lack of certification is a material issue because it is a legitimate factor for a jury to take into account to determine whether the Defendant was qualified and competent to undertake the procedures involved and whether she was capable of meeting the standards of the speciality [sic]."

During the trial, Dr. Epting's counsel requested the record show Dr. Epting taking the witness stand as a party, not as

an expert. Counsel stated he was not asking for any ruling at all, but was merely putting it on the record. During cross-examination, Mr. Ward's counsel brought out the fact that Dr. Epting had twice failed the examination for certification.

Where a physician sued for malpractice testifies as an expert, evidence as to his age, practice, and like matters going to his qualifications as an expert is admissible. 61 Am. Jur. (2d) *Physicians, Surgeons, and other Healers*, Section 346 (1981).

Although Dr. Epting stated she would not testify as an expert, her qualifications as an anesthesiologist were brought out on direct examination. Her counsel asked if she had a separate license for anesthesia. She testified as to routine surgical and recovery room procedures in addition to her own actions in the circumstances of this case. She gave her opinion to a reasonable degree of medical certainty as to how air got into Mrs. Ward's stomach, and when the tube moved into the esophagus. On cross-examination she gave her opinion that Mrs. Ward had a bronchospasm in the lower part of the lungs.

We hold the record shows Dr. Epting testified as an expert on medical issues. The fact she was not board certified relates to her credibility as a witness since she gave medical opinions. This argument is without merit.

## IV.

Dr. Epting argues the court erred in admitting into evidence a photograph of Mrs. Ward's face taken after her death. Dr. Epting moved in a pre-trial conference to exclude the photograph from evidence. She claims the photograph is irrelevant to the question of damages in a wrongful death suit and serves merely to inflame or prejudice the jury. The judge found the photograph illustrative of the issue of placement of the tube and anatomically significant. In the judge's opinion, the photograph was relevant, and its probative value outweighed any inflammatory aspects.

Determination of the relevancy of a photograph as evidence is a matter largely within the trial court's discretion. *Elliott v. Black River Electric Cooperative*, 233 S. C. 233, 104 S. E. (2d) 357 (1958). At trial, the pho-

tograph was used by the pathologist and Mr. Ward's anesthesia expert, and in cross-examination of Dr. Epting and her expert, Dr. Klein. The photograph illustrates the placement of the endotracheal tube, the post-operative swelling, and the bandages. It provides the jury with an anatomical frame of reference which is significant in this case. We agree with the trial judge, and find this argument to be without merit.

## V.

Dr. Epting argues the court erred in allowing into evidence testimony of Mrs. Ward's future earnings.

She first alleges Mr. Ward's testimony of his wife's intention to return to work in January 1984 is hearsay. Mr. Ward testified regarding their plan that Mrs. Ward would return to work when their baby was six months old. He testified of his own personal knowledge as a partner in their family plans, not from any other source. This is not hearsay. *Ellison v. Pope*, 290 S. C. 100, 348 S. E. (2d) 367 (Ct. App. 1986); 29 Am. Jur. (2d) *Evidence* Section 497 (1967). Moreover, Dr. Epting declined to cross-examine Mr. Ward to test the trustworthiness of his statements.

Dr. Epting also alleges testimony by Gerald Althen, Mrs. Ward's employer, was hearsay. Mr. Althen testified he intended to rehire Mrs. Ward on January 1, 1984. Dr. Epting's counsel entered a hearsay objection. The court overruled the objection, stating "The gentleman can testify as to what he planned to do." This does not constitute hearsay.

Dr. Epting also charges that testimony of Mrs. Ward's plans to return to work is speculative. We disagree. Our Supreme Court has recognized that evidence of earnings from past employment is admissible to enable the jury to determine what the future earnings would have been if the injury or death had not occurred. *Matthews v. Porter*, 239 S. C. 620, 124 S. E. (2d) 321 (1962).

We find this evidence to be neither hearsay or speculative. In any event, Mr. Althen's testimony was surplus to Mr. Ward's testimony. Inadmissible evidence, if cumulative to previously admitted evidence, does not constitute an error requiring reversal. *Jackson v. Price*, 288 S. C. 377, 342 S. E. (2d) 628 (Ct. App. 1986). No error has been shown.

Dr. Epting next argues the court admitted speculative, hearsay testimony in permitting Mr. Ward's expert witness to state an opinion as to future lost earnings. The economist, Dr. Wood, projected a total financial loss to Mrs. Ward's family of $481,358.00. This figure represented a projected loss of family services and of earnings based on Mrs. Ward's return to her former job. The judge charged the jury they may consider pecuniary loss, mental shock and suffering, loss of companionship, deprivation of the comfort of Mrs. Ward's society, and funeral expenses, among other losses. It is apparent that Dr. Wood's testimony as to loss of earnings was one among many factors the jury could consider in reaching a verdict. We believe, moreover, that the testimony was based on admissible evidence regarding Mrs. Ward's work plans, as shown above. We affirm the admission of evidence relating to Mrs. Ward's loss of future earnings.

## VI.

Dr. Epting argues the court abused its discretion in refusing to allow redirect examination of a defense witness, where the plaintiff had cross-examined the witness by publishing portions of his deposition testimony. The witness, Gary McKesson, was a respiratory therapist who participated in the attempt to revive Mrs. Ward.

McKesson testified on direct examination that he looked through the bronchoscope inserted by Dr. Epting. McKesson testified the tube was below the vocal cords and he saw what he supposed to be the vocal cords as the bronchoscope was being removed. This would indicate the tube was positioned in the trachea. On cross-examination, his deposition testimony that he had "seen" the vocal cords, not merely movement which he supposed to be the vocal cords, was brought out. If the vocal cords were seen, the tube had to be out of the trachea or just barely above the trachea. On redirect Dr. Epting's counsel read from the deposition testimony that McKesson believed he had seen the vocal cords because of movement around the tube. On recross-examination, Mr. Ward brought out deposition testimony which implied that McKesson could see the inflated cuff through the bronchoscope. It is highly unlikely the cuff could be viewed

through the bronchoscope.

Following recross-examination, the court asked the witness to step down, stating "no more recross and no more redirect." Although both counsel approached the bench, the conference was off the record and does not appear in the transcript. Moreover, Dr. Epting's counsel did not object to the court's refusal to allow still more redirect examination, nor was the redirect testimony proffered. If counsel fails to make an offer of proof as to excluded evidence, or fails to include an offer of proof in the record, there is nothing to review. *Goldkist, Inc. v. Citizens and Southern National Bank*, 286 S. C. 272, 333 S. E. (2d) 67 (Ct. App. 1985). An objection not raised in or passed on by the trial court will not be considered on appeal. *Hall v. Palmetto Enterprises II, Inc. of Clinton*, 282 S. C. 87, 317 S. E. (2d) 140 (Ct. App. 1984).

The extent of redirect examination is subject to the court's discretion. *State v. Tyner*, 273 S. C. 646, 258 S. E. (2d) 559 (1979). Moreover, Dr. Epting has failed to show how the court's refusal to allow redirect examination was prejudicial error. *Id.* As counsel for Mr. Ward points out, McKesson's testimony as to the position of the endotracheal tube was already in evidence. This argument is without merit.

## VII.

Dr. Epting argues the court erred in failing to give her credit for Mr. Ward's pretrial settlement for the pain and suffering and wrongful death causes of action against the oral surgeon, Dr. James Ingrassia, for $30,000.00. In the Covenant Not to Sue, $29,500.00 was allocated to the pain and suffering cause of action, and $500.00 to the wrongful death action. Mr. Ward had voluntarily dismissed the pain and suffering cause of action against Dr. Epting prior to trial, but after the settlement with Dr. Ingrassia.

Dr. Epting argues the settlement was a de facto settlement of the wrongful death action, since there was insufficient evidence to support a cause of action for pain and suffering. She moved *in limine* to assign the full amount of the settlement to the wrongful death action against her.

The judge found in a post-trial order dated April 8, 1985,

that Dr. Epting could not attack the covenant absent a showing of fraud or lack of jurisdiction. The judge concluded no such showing had been made. He rejected Dr. Epting's argument that the pain and suffering cause of action was a sham, citing testimony from various witnesses which would have been sufficient to present a jury question under *Croft v. Hall*, 208 S. C. 187, 37 S. E. (2d) 537 (1946). The judge therefore denied Dr. Epting's motion, deducted the $500.00 settlement of the wrongful death action from the verdict, and entered judgment for Mr. Ward in the amount of $399,500.00.

The record contains evidence from testimony of Dr. ██ ██ Epting and a recovery room nurse that Mrs. Ward was responding to directions given to her following surgery and in the recovery room. If there is any evidence from which the jury could reasonably find conscious pain and suffering, a factual issue is presented. *Croft v. Hall, supra.* We find there was sufficient evidence to present a jury question on conscious pain and suffering. A nonsettling defendant is entitled to a *pro tanto* reduction of a judgment in the same cause of action. *Powers v. Temple*, 250 S. C. 149, 156 S. E. (2d) 759 (1967). The order complied with *Powers* in reducing the wrongful death verdict. We find no merit in this exception, and affirm the trial judge's order.

## VIII.

Dr. Epting argues the judge erred in refusing two of her requested charges. The first was:

Among the factors which may be considered in determining the degree of care required of a physician are the degree of care exercised generally in the locale in which she practiced, the medical facilities available to her, and the nature of the disease that she was required to treat in the case at hand.

Dr. Epting asserts this charge was practically verbatim from *King v. Williams*, 276 S. C. 478, 279 S. E. (2d) 618 (1981). In fact, *King* specifically discarded the "locality" rule and adopted a standard of care not bound by any geographical restriction. Locality was retained as a factor for consideration. *King* approved a standard of care which is "that of an

average, competent practitioner acting in the same or similar circumstances." The judge charged the jury the physician "must exercise that degree of knowledge and skill ordinarily possessed by physicians in good standing practice [sic] under similar circumstances."

Dr. Epting further asserts that evidence from Mrs. Ward's former physician and two experts established Mrs. Ward's hypersensitive airway which resulted in her death from bronchospasm. Therefore, the "nature of the disease she was required to treat" was an essential part of her defense. There is no evidence, however, that Dr. Epting would have changed her course of treatment. She testified that Mrs. Ward died due to bronchospasm, and nothing she could have done would have prevented her death. Where an error in refusing a request to charge is alleged, the party seeking reversal must show harm prejudicial to his chances of success. *Greenville Housing Authority v. Massey*, 281 S. C. 618, 316 S. E. (2d) 722 (Ct. App. 1984).

Dr. Epting next alleges error in the judge's refusal to charge her request to charge number six:

proof of departure from established standards of practice does not create an inference of negligence if the departure is justified under the circumstances.

Dr. Epting maintains her request was supported by the record, which contains justifications for removing the tube in the operating room, for not sooner cutting the wires holding the jaw closed since she was convinced the tube was properly placed, and in not administering sodium bicarbonate after the first blood gas was taken because the blood gas showed a respiratory, rather than metabolic, acidosis.

The judge charged "a bad result or failure to cure or diagnose properly is not by itself sufficient to raise an inference or presumption of negligence on the part of the physician." A medical malpractice case must involve charges of deviation from the standard of care. *Cox v. Lund*, 286 S. C. 410, 334 S. E. (2d) 116 (1985). In this case, the judge's charge on negligence and standard of care is virtually identical to that approved in *Cox*. Furthermore, any error in the trial court's failure to charge the requested instructions is not prejudicial where the instructions given

to the jury in the general charge afforded a proper test for determining the issues. *Hook v. Rothstein,* 281 S. C. 541, 316 S. E. (2d) 690 (Ct. App. 1984), *cert. denied,* 283 S. C. 64, 320 S. E. (2d) 35 (1984). In this case, the jury was properly charged on the law of negligence and standard of care. No error has been demonstrated.

## IX.

Finally, Dr. Epting asserts there was insufficient evidence to create jury issues of deviations from an accepted standard of care and of the proximate cause of Mrs. Ward's death. We disagree.

Dr. Epting maintains the only alleged issue of deviation from the standard of care is that she placed the endotracheal tube in the esophagus, and then failed to discover that the tube was misplaced. She asserts Mr. Ward's case is based on purely circumstantial evidence, not upon facts in the record.

Mr. Ward maintains misplacement of the tube is not the only deviation from the proper medical standard of care shown. He asserts, however, that even if it were the only deviation alleged, sufficient evidence was presented to establish the endotracheal tube was placed in the esophagus instead of the trachea.

Mr. Ward points to the following evidence which establishes this mistake: (1) the pathologist found the tube in the esophagus at the autopsy; (2) the chest x-ray taken at noon, almost one hour before resuscitation efforts ceased, showed the tube in the esophagus; (3) parts of the esophagus around the tube were eroded, apparently by the motion of the tube; (4) the pathologist's report showed no signs of any kind of bronchospasm or asthma; (5) attempts to pass a nasogastric tube through the esophagus to decompress any air remaining in her stomach were unsuccessful; (6) expert witnesses testified Dr. Epting deviated from the applicable standard of care by removing the tube too quickly following the surgery, by failing to immediately cut the wires holding the jaw to determine the tube was properly placed, by failing to recognize from the blood gas study that the wires should be cut and the tube properly placed, and by failing therefore to administer sodium bicarbonate to neutralize the acidosis.

Evidence also established it was extremely unlikely the tube had slipped up four inches out of the trachea and into the esophagus. Mr. Ward argues the opinions of his experts were based on objective data such as the autopsy, blood gas tests, x-ray, pupil dilation, and continuing cyanosis.

The plaintiff in a medical malpractice case must establish both the standard of care and the doctor's failure to conform to that standard. *Carver v. Medical Society of South Carolina*, 286 S. C. 347, 334 S. E. (2d) 125 (Ct. App. 1985); *Cox v. Lund, supra.* In addition to proving negligence, he must prove this negligence was a proximate cause of the injury. *Carver v. Medical Society of South Carolina, supra.* The probative value of expert testimony stands or falls upon an evidentiary showing of the facts upon which the opinion is, or must logically be, predicated. *Young v. Tide Craft, Inc.,* 270 S. C. 453, 242 S. E. (2d) 671 (1978). In this case, the record contains ample evidence to support submission to the jury on the issues of a deviation of the standard of care and that this deviation was the proximate cause of Mrs. Ward's death.

For the reasons stated above, the judgment on all issues in this case is

Affirmed.

BELL and GOOLSBY, JJ., concur.