803 S.E.2d 475

The OAKS AT RIVERS EDGE PROPERTY OWNERS ASSOCIA-TION, INC., John E. Atkinson, Joan D. Strandquist, Joseph E. Chiovarou, Jr., Peyton H. Cook, Jr., Brenda Cook, John W. Edelen, Karen A. Nelson, Robert J. Graham, Maureen S. Graham, Nancy K. Johnson as trustee for the Nancy K. Johnson Revocable Trust, William Jung, Charles Maraziti, Patricia Maraziti, George S. Pollard, Eleanor J. Pollard, Robert Reece, Gerard M. Ruvo and Sue S. Ruvo as trustees for the Ruvo 2006 Living Trust, Carolyn M. Jennings, Thomas Edward Keane, Edward Wallace Barr, III, Richard B. Pekruhn, Pauline Pekruhn, Matthew J. Severance, and Elizabeth Ashley Phillips Severance, Respondents,

v.

DANIEL ISLAND RIVERSIDE DEVELOPERS, LLC and Carriage Hill Associates of Charleston, LLC, Appellants.

Appellate Case No. 2014-002390
Opinion No. 5507
Court of Appeals of South Carolina.
Heard November 17, 2016
Filed August 2, 2017
Rehearing Denied October 19, 2017

426

428

Charles S. Altman and Meredith L. Coker, both of Altman & Coker, LLC, and Roy Pearce Maybank and Amanda R. Maybank, both of Maybank Law Firm, LLC, all of Charleston, for Appellants.

Michael Brent McDonald and Walter Henry Bundy, Jr., both of Bundy McDonald, LLC, of Summerville, for Respondents.

KONDUROS, J.:

In this case regarding defective construction, Daniel Island Riverside Developers, LLC (DIRD) and Carriage Hill Associates of Charleston, LLC (CHAC) (collectively, Appellants) contest on appeal the trial court's award of damages to Respondents, arguing the court should have offset the damages with the amount Respondents previously received through settlement. Further, Appellants contend the trial court should have allocated the damages among the various defendants and erred by entering an order prior to Respondents' election of remedies. Finally, Appellants assert the damages were excessive, speculative, and not supported by the evidence and constituted a double recovery. We affirm.

**FACTS/PROCEDURAL HISTORY**

The Oaks at Rivers Edge Horizontal Property Regime (The Oaks) is located on Daniel Island and comprised of six buildings, with six condominium units in each building. The Oaks was constructed over a period from 2003 through 2006. DIRD was the developer of the Project. DIRD contracted with CHAC to be the construction manager for the Project. DIRD sold the units for an average of $650,000, although many unit owners paid substantially more for their units as they purchased their units or contracts from intermediate third parties.[1] DIRD appointed board members to the board of the Oaks at Rivers Edge Property Owners Association (the POA) until control of the POA was turned over to the unit owners on or after December 7, 2006.

---

1. Many unit owners paid in the $700,000 range up to $900,000.

Before purchasing their units, prospective purchasers received brochures marketing the condominiums. These marketing documents advertised an "incredible array of standard luxuries." The luxuries included things like oak flooring, soundproofing between all units, and an exterior brick-and-stucco façade. However, numerous issues later arose with the condominiums. The units were not soundproof. The units had numerous leaks caused by air-conditioning units, plumbing, and faultily installed windows and doors. The leaks within the walls resulted in the growth of mold in the units. The hardwood floors also warped and separated in multiple places in the units.

Multiple lawsuits arose from the project. As part of the litigation, in February 2011, the POA obtained an estimate from Southeastern Construction for $11,807,884 to repair the six buildings. Prior to the scheduled date of trial, several settlements occurred among the various parties. The total settlement amount paid to the POA was $7,702,552. Of that amount, $3,700,000 was paid by CHAC; DIRD; Carriage Hill Associates, Inc. (CHANY)[2]; the architects on the project, Gerald Rumplick and Edward D'Orazio; and Richard Behringer. The other $4,002,552 was paid by Weather Shield; The Muhler Company, Inc.; A.C. Construction, Inc.; and Coastal Caulking.

The Memorandum of Settlement stated, "Whether or not CHAC and DIRD will receive credit on the judgment for amount paid by CHANY, Architects and Richard Behringer in his individual capacity, or any amount paid by other defendants in settlement will be determined by the court consistent with South Carolina law." The POA and individual unit owners (Unit Owners) (collectively, Respondents) agreed to "dismiss with prejudice claims against [Appellants] only for UTPA, piercing, fraud, individual liability, amalgamation, aiding and abetting, aiding and abetting breach of fiduciary duty, and breach of contract accompanied by a fraudulent act." It further specified, "The remaining claims against [Appellants] only, are breach of fiduciary duty, negligent misrepresentation, negligence, breach of express and implied warranties,

---

2. CHANY was based in New York and formed CHAC to do local construction management.

including, but not limited to, habitability, fitness for a particular purpose, and workmanlike service, and breach of contract." They also agreed "not to seek punitive damages or attorneys' fees arising out of any cause of action, against [Appellants], only." Appellants were among the signors.

The settlement agreement and release specified "this Agreement is only a Partial Release by the POA as to [Appellants]." It stated "the POA's release by and of [Appellants] is limited to the terms of the Memorandum of Settlement and does not in any way apply to the claims currently pending before the [trial court]." For $3.7 million, the POA discharged Appellants "consistent with the terms of the Memorandum of Settlement and specifically reserving all claims pending at the time of this Agreement before the [trial court]." For $4,002,552, the POA released Weather Shield, Muhler, A.C., and Coastal Caulking for all damages resulting from the design, manufacture, sale, and installation of the windows, window units, exterior doors, exterior door units, railings, balustrades, framing, and caulking. Appellants signed the agreement.

At the bench trial, several Unit Owners testified about the problems they experienced with their units, including sound transmission between the units, mold problems, and hardwood flooring separating. Appellants and Respondents then stipulated the remaining homeowners would testify to having the same sound problems with their units. Several Unit Owners also testified about their inability to sell their units. Others indicated the people renting their units had moved out because of mold, the lack of soundproofing, and other safety concerns. Owners who were able to sell the units testified as to the amount of loss they sustained. For example, Robert Reece testified that after buying his unit for $716,850, it appraised at $940,000, but it sold for only $377,000.[3]

---

3. Other Unit Owners sustained losses when selling their units as well. Robert Graham purchased his unit for $675,000 and sold it for $330,000. Karen Nelson testified she bought her unit for $686,000; short-sold it for $330,000; and paid the bank a deficiency judgment of $90,000. Terry Johnson provided he purchased his unit for $670,633 and sold it for $490,000. Brenda Cook indicated she short-sold her unit for $350,000.

Both sides presented expert testimony about what needed to be done to correct the problems with the buildings. Dr. Noral Stewart testified on behalf of Appellants as to what had already been done to remedy the sound problems. Mike Parker also testified as an expert for Appellants about the leaks. Respondents presented the expert testimonies of Theodore Padgett, who described what he believed needed to be repaired in the buildings, and David Willis, who testified as to the costs of those repairs.

The trial court found Appellants jointly and severally liable for negligence, gross negligence, and negligent misrepresentation. It also found DIRD liable to the POA for breach of fiduciary duty. It found DIRD liable to the Unit Owners for breach of implied warranty of habitability. It additionally found CHAC liable to the POA and Unit Owners for breach of implied warranty of workmanlike service.

The trial court awarded the POA $7,934,704.06 from Appellants for the cost of repair, $793,470.41 for engineering fees at 10% of cost to repair, and $641,520 for moving, storage, and replacement lodging. It also determined DIRD was liable for an additional $19,440 for the failure to fund the reserves as promised. It awarded individual Unit Owners differing amounts of damages specific to them. These damages included loss of market access, lost rent, inconvenience, out of pocket costs, and costs due to defective floors. Several of these Unit Owners had to elect between damages for loss of market access or loss of rent. One Unit Owner had to elect between damages from inability to refinance or loss of market access.

Appellants moved for allocation of damages and setoff, contending they were entitled to a setoff equaling the total amount of the settlement. Appellants also moved for judgment notwithstanding the verdict (JNOV), new trial absolute, new trial nisi remittitur, to alter or amend judgment, and relief from the order, arguing the damages award was not supported by the evidence, was speculative, and constituted a double recovery. Following a hearing and further memorandum, the trial court denied all of Appellants' motions. This appeal followed.

## LAW/ANALYSIS

### I. Setoff

 Appellants argue the trial court erred in failing to setoff the damages it awarded by the amount previously received by Respondents from the settling defendants prior to trial, asserting the evidence presented at trial established the damages were for items that were the responsibility of the settling defendants, thereby resulting in a double recovery to the Respondents. We disagree.

A nonsettling defendant is entitled to credit for the amount paid by another defendant who settles. The reason for allowing such a credit is to prevent an injured person from obtaining a second recovery of that part of the amount of damages sustained which has already been paid to him. In other words, there can be only one satisfaction for an injury or wrong. However, the reduction in the judgment must be from a settlement for the same cause of action.

 *Welch v. Epstein*, 342 S.C. 279, 312-13, 536 S.E.2d 408, 425 (Ct. App. 2000) (citations omitted); *see also Rutland v. S.C. Dep't of Transp.*, 400 S.C. 209, 216, 734 S.E.2d 142, 145 (2012) ("A non[ ]settling defendant is entitled to credit for the amount paid by another defendant who settles for the same cause of action.").

A settlement by a joint tortfeasor "reduces the claim against the others to the extent of any amount stipulated by the release or the covenant." Therefore, before entering judgment on a jury verdict, the court must reduce the amount of the verdict to account for any funds previously paid by a settling defendant, so long as the settlement funds were paid to compensate the same plaintiff on a claim for the same injury.

 *Smith v. Widener*, 397 S.C. 468, 471-72, 724 S.E.2d 188, 190 (Ct. App. 2012) (quoting S.C. Code Ann. § 15-38-50(1) (2005)).

The trial court's jurisdiction to set off one judgment against another is equitable in nature and should be exercised when necessary to provide justice between the parties. A set[ ]off is not necessarily founded upon any statute or fixed rule of court, but grows out of the inherent equitable jurisdiction of the court. Therefore, such motions are addressed to the

discretion of the court—a discretion which should not be arbitrarily or capriciously exercised.

■ *Welch*, 342 S.C. at 313, 536 S.E.2d at 425-26.

The right to setoff has existed at common law in South Carolina for over 100 years. Allowing setoff "prevents an injured person from obtaining a double recovery for the damage he sustained, for it is almost universally held that there can be only one satisfaction for an injury or wrong."

■ *Riley v. Ford Motor Co.*, 414 S.C. 185, 195, 777 S.E.2d 824, 830 (2015) (citation omitted) (quoting *Rutland*, 400 S.C. at 216, 734 S.E.2d at 145). "In 1988, these equitable principles were codified as part of the South Carolina Contribution Among Tortfeasors Act (the Act), [sections] 15-38-10 to -70 [of the South Carolina Code] (2005 & Supp. 2014)." *Riley*, 414 S.C. at 195, 777 S.E.2d at 830. "[T]he Act represents the Legislature's determination of the proper balance between preventing double-recovery and South Carolina's 'strong public policy favoring the settlement of disputes.' " *Id.* at 196, 777 S.E.2d at 830 (quoting *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 698 S.E.2d 559 (2010)).

Section 15-38-50 provides:

When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

(1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

(2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

S.C. Code Ann. § 15-38-50 (2005).

■ "When the settlement is for the same injury, the nonsettling defendant's right to a setoff arises by operation of law. Under this circumstance, '[s]ection 15-38-50 grants the court no discretion ... in applying a set[ ]off.' " *Smith*, 397 S.C. at 472, 724 S.E.2d at 190 (alterations by court) (citation

omitted) (quoting *Ellis v. Oliver*, 335 S.C. 106, 113, 515 S.E.2d 268, 272 (Ct. App. 1999)). "Section 15-38-50 grants the court no discretion in determining the equities involved in applying a set[ ]off once a release has been executed in good faith between a plaintiff and one of several joint tortfeasors." *Ellis*, 335 S.C. at 113, 515 S.E.2d at 272.

> Despite a defendant's entitlement to setoff, whether at common law or under section 15-38-50, any "reduction in the judgment must be from a settlement for the same cause of action." Thus, where a settlement involves more than one claim, the allocation of settlement proceeds between various causes of action impacts the amount a non[ ]settling defendant may be entitled to offset.

*Riley*, 414 S.C. at 196, 777 S.E.2d at 830 (citation omitted) (quoting *Hawkins v. Pathology Assocs. of Greenville, P.A.*, 330 S.C. 92, 113, 498 S.E.2d 395, 407 (Ct. App. 1998)); *see Ward v. Epting*, 290 S.C. 547, 559-60, 351 S.E.2d 867, 874-75 (Ct. App. 1986) (refusing to apply settlement for pain and suffering cause of action to judgment in wrongful death action).

Our supreme court has agreed with the following apportioning approach taken by the Illinois Court of Appeals:

> A plaintiff who enters into a settlement with a defendant gains a position of control and acquires leverage in relation to a nonsettling defendant. This posture is reflected in the plaintiff's ability to apportion the settlement proceeds in the manner most advantageous to it. Settlements are not designed to benefit nonsettling third parties. They are instead created by the settling parties in the interests of these parties. If the position of a nonsettling defendant is worsened by the terms of a settlement, this is the consequence of a refusal to settle. A defendant who fails to bargain is not rewarded with the privilege of fashioning and ultimately extracting a benefit from the decisions of those who do.

*Riley*, 414 S.C. at 197, 777 S.E.2d at 831 (quoting *Lard v. AM/FM Ohio, Inc.*, 387 Ill.App.3d 915, 327 Ill.Dec. 273, 901 N.E.2d 1006, 1019 (2009)).

 Here, Appellants argue specifically the trial court should have setoff the amount of damages awarded with the amount already paid for the replacement of windows, doors, and brickwork as well as damage to sheathing in a settlement

with the window manufacturer, installers, and framers. However, the trial court's order includes repairs independent of those addressed by the settlement for the issues relating to the windows. For example, the brick and stucco would have had to be replaced in its entirety to install the missing wall insulation that was not originally installed and to fix the incorrectly installed lath. Further, the stucco was not installed according to code in the first place and would need to be reinstalled.

Additionally, Padgett testified the brick could be lifted out because it was not bonded, violated the building code, and lacked horizontal joint reinforcement, necessitating replacement.

Padgett also testified the water intrusion to the stucco came from many different sources, not just the windows. For example, he indicated the felt that was intended to create a water resistant barrier was improperly installed. Padgett's report of proposed repairs stated: "The principal avenue of water intrusion behind the weather protection system was identified to be the intersection of the single ply roof membrane with the roof eave and sidewall." The report also provided "the principal source of water intrusion was observed to be the intersection of the roof membrane with the exterior walls. The excessive level of wall damage is attributable to the lack of drainage features within the stucco system."

When asked what was wrong with the stucco, Padgett responded:

Well, the first thing is that there's no head flashing at any of the windows or doors. The second is there's no drainage feature provided at the bottom of—at the bottom of any wall that I found. And those are important because stucco is considered to be a wet material; that is, it's going to absorb moisture from the atmosphere and it's going to be wet on the back side. What you have to do is provide an avenue for that water to get out of the wall cross section. Those are code requirements. Both of those are code requirements.

He testified all of the stucco needed to be removed. He further provided that even if there were no problem with the windows, the stucco would have to be removed due to the numerous code defects. He also indicated, "The lack of drain-

age is not—drainage is not provided. There would be damage otherwise. And the rest of these, the installation of life goes to long-term performance in things like wind, windstorms. So in order to get what they were supposed to, have, all the stucco has got to go."

Padgett also testified he found other problems "with the brick veneer. These are code issues. When we opened up the brick in numerous locations we did not find any horizontal joint reinforcement." He also stated the brick did not meet code requirements due to earthquakes and the buildings would be uninhabitable if an earthquake occurred. He indicated all of the bricks need to be taken off and replaced. He testified this would be the situation even if there had been no problems with the windows and stucco. He additionally explained wall insulation was missing in numerous places and the stucco and brick would have to be removed to remedy that. Padgett estimated the windows and doors could account for 25% of the brick removal but did not trigger the need for replacing the exterior cladding. He noted surgical repairs in stucco are very difficult and the economical way to handle the problems is to reclad.

 Willis prepared a cost estimate for the work described by Padgett. Willis testified that all of the stucco and brick have to come off in spite of the windows and doors because the plywood and studs were comprised. He also indicated the stucco declad was independent from the windows and doors and there was already rot because of the stucco declad's failing. He stated that for stucco it is cheaper to remove it all and start over, rather than try to salvage parts of it. He further provided entire building had to be decladded due to the missing the brick ties. Willis stated his estimate included removing and replacing 70 to 80% of the brick with a built-in contingency in case more needed to be removed.[4]

---

4. Willis testified he had not calculated the amount of brick that needed to be removed that was attributable to the windows. Upon the trial court's request, the parties agreed Willis would prepare affidavit on the amount of brick and stucco replacement necessary due to windows and doors. However, no affidavit is contained in the record. "[T]he appellant ... has the burden of presenting this [c]ourt with an adequate record." *Goode v. St. Stephens United Methodist Church*, 329 S.C. 433, 446, 494 S.E.2d 827, 834 (Ct. App. 1997).

At the post-trial hearing, Appellants stated "the damages estimate that was presented ... by the plaintiffs excluded the windows." "[T]here were these discussions about, well, they are only going to have to take off 18 percent of some stucco and 12 percent of some brick. And though your order says it's uncontested, it was contested. Mr. Parker and Mr. Padget[t] both said more likely than not, all of it is going to have to come off." "Because of the way that [Respondents] shifted the windows out right prior to trial, kind of puts the acoustics back in."

However, Respondents removed from their claim the repairs necessitated by the damage caused by the window installation. Accordingly, Appellants have already received a reduction in claims as contemplated by section 15-38-50 of the South Carolina Code. Respondents explained at the post-trial hearing,

When we were going to trial in Berkeley County that day, the number we were going to put upon the board for all the damages that we claimed at that point was $12,988,670.40. That's exclusive of the individual owner's claims. This is just cost to repair and cost to replace the windows and everything that—thereafter that was involved in that case.... [W]e settled with certain defendants, and then we came to trial. And the number we asked for at trial was $8,728,174.47. We reduced our damage claim by $4,260,497.93. Those damages were what was not put in your case.

Respondents further explained, "We could have come in and asked Your Honor to award the total number that we went for in Berkeley County of $12,988,672.40. And we would be in front of you today admitting that they were entitled to a setoff of that 4 million some odd dollars."

Although Parker testified the stucco did not contribute to the leaking and all brick and stucco needed to come off because of the windows in part because brick is hard to match he did not evaluate the brick and stucco to determine if it was up to code or evaluate its workmanship. Parker indicated that when issues had originally arisen with the windows and doors and he had recommended replacing them, he only believed part of the brick needed to be replaced then. However, the

trial court relied instead on Padgett's testimony and found all of the other defects in the construction necessitated the brick and stucco replacement.

The trial court did not err in denying Appellants' motion for a setoff. We agree with Respondents that Appellants already received the benefit of the settlements. Accordingly, we affirm the trial court's denial of Appellants' motion for setoff of the amounts received by Respondents in prior settlements.

## II. Election of Remedies

Next, Appellants maintain the trial court erred in failing to address the allocation of damages[5] and entering an order prior to Respondents' election of remedies, thus resulting in a double recovery to Respondents. Appellants also contend the Unit Owners received a double recovery by the trial court awarding damages for loss of market access to the Unit Owners as well as awarding the cost of repairs to the POA. They also assert the trial court awarded a double recovery to the Unit Owners by awarding damages for loss of quiet enjoyment in addition to loss of market value. Further, Appellants argue the trial court erred in awarding damages for loss of quiet enjoyment and loss of market access when the Unit Owners failed to meet their burden of proof and establish they were entitled to such damages. We disagree.

"Election of remedies involves a choice between different forms of redress afforded by law for the same injury or different forms of proceeding on the same cause of action." *Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 56, 691 S.E.2d 135, 152-53 (2010) (quoting *Taylor v. Medenica*, 324 S.C. 200, 218, 479 S.E.2d 35, 44 (1996)). "It is the act of choosing between inconsistent remedies allowed by law on the same set of facts." *Taylor*, 324 S.C. at 218, 479 S.E.2d at 44-45. "The basic purpose of election of remedies is to prevent double

---

5. Appellants argue the trial court failed to allocate damages pursuant to section 15-38-15(A) of the South Carolina Code (Supp. 2016). However, the trial court found Appellants were grossly negligent, and section 15-38-15(F) of the South Carolina Code (Supp. 2016) provides that the right to allocation does not apply in those cases. *See* § 15-38-15(F) ("This section does not apply to a defendant whose conduct is determined to be wilful, wanton, reckless, [or] grossly negligent...."). Accordingly, the trial court did not err in denying that motion.

recovery for a single wrong. 'When an identical set of facts entitle the plaintiff to alternative remedies, he may plead and prove his entitlement to either or both; however, the plaintiff may not recover both.'" *Austin*, 387 S.C. at 56, 691 S.E.2d at 153 (citation omitted) (quoting *Save Charleston Found. v. Murray*, 286 S.C. 170, 175, 333 S.E.2d 60, 64 (Ct. App. 1985)). "Where a plaintiff presents two causes of action because he is uncertain of which he will be able to prove, but seeks a single recovery, he will not be required to elect." *Adams v. Grant*, 292 S.C. 581, 586, 358 S.E.2d 142, 144 (Ct. App. 1986). "As its name states, the doctrine applies to the election of 'remedies' not the election of 'verdicts.'" *Austin*, 387 S.C. at 57, 691 S.E.2d at 153.

> The plaintiff should have a full opportunity to prove his claim to some form of relief, but he should not receive a double recovery. The invocation of one remedy constitutes an election of remedies that will bar another remedy consistent therewith where the suit upon the remedy first invoked reached the stage of final adjudication.

*Brown v. Felkel*, 320 S.C. 292, 294, 465 S.E.2d 93, 95 (Ct. App. 1995) (citation omitted).

 Additionally, the trial court did not err in awarding Respondents damages for both loss of access to the market and the cost of repairs. The loss of market access damages accounted for the loss Unit Owners experienced in the value of their units due to the downturn in the housing market. Unless the housing market rebounded to the place where it was before the market crashed, the Unit Owners could not regain the money they lost because they were unable to sell due to the issues with their units and the subsequent litigation. If not for the problems with the units, the owners could have had the choice to sell their units before or during the crash. The record contains testimony from the Respondents' real estate appraisal expert—Christopher Donato—and the Unit Owners to that effect. The cost of repairs was simply the cost to place the buildings and units in the physical condition they should have been in when the Developer initially sold them—such as fully in compliance with building code requirements, without mold, without leaks, and not able to hear activities in other units. They suffered two separate injuries with two different

sets of damages. Therefore, the award did not constitute a double recovery.

■ Further, there is no double recovery for the award of damages for loss of market access as well as the loss of quiet enjoyment. The loss of quiet enjoyment is the loss the Unit Owners experienced in having to live in what was marketed to them as luxury condominiums but in reality hearing their neighbors in other units go about their daily activities and put up with the bother of moving out of their units for several months for repairs. These are distinct injuries from the loss of market access described by Donato.

■ These damages are supported by testimony contained in the record. Unit Owners testified they were unable to sell their property before the housing market crashed. Multiple Unit Owners testified they tried to sell their units earlier but the buyers backed out once hearing about problems from others living there or learned about the lawsuits. Some Unit Owners thought they needed to wait for the sound remediation to take place so they would not be selling a property with defects. Prospective buyers could not get financing with the ongoing litigation. Some Unit Owners were unable to refinance due to the issues. Several Unit Owners testified they could not sell their units because of issues with them. Brokers showing the properties to prospective buyers knew about the issues with the units. One Unit Owner had renters who had the option to purchase but they decided not to because of sound issues they experienced while living there. Another Unit Owner testified he bought the unit planning to move in but did not because of the problems. An additional Unit Owner stopped renting his unit due to the mold problem. Several renters chose to move out because of the ongoing problems. Some Unit Owners had to drop the price they were renting their units for to get tenants. One Unit Owner tried to sell her unit back to the Developer for the price she paid for it but the Developer did not want to repurchase it.

Owners of property not in this development had option to sell property before the housing market crashed. Respondents' appraisal expert, Donato, explained the Unit Owners were denied market access. Some Unit Owners listed their units for sale and could not sell. Others sold their units at a substantial loss. Others chose not to put their units on the

market upon advice they would not be able to sell them in the current condition. Several Unit Owners testified about the housing market downturn that occurred. Donato also testified the defects alone caused a reduction in value of 30 to 40%. Based on all of this, the record contains evidence to support the trial court's finding these damages were not a double recovery and thus there was no need to elect a remedy.[6]

## III. Damages Unsupported by Evidence

 Appellants assert the trial court abused its discretion in awarding damages that were excessive, speculative and not supported by the evidence and constituted a double recovery. They contend the award of damages for acoustic repairs/sound remediation was not supported by the testimony and evidence presented at trial.[7]

 They also maintain the damages award of $7,934,704.06 to the POA for the cost of repairs was excessive and not supported by the evidence in that it erroneously included the cost to remove and replace the stucco and brick ($1,091,971.50). Further, they argue the trial court erred in awarding damages for upgrades and storage costs when most Unit Owners did not reside in their units and such an award was grossly excessive.[8] We disagree.

---

6. The trial court required some Unit Owners to elect between loss of market access and loss of rent damages and one to elect between inability to refinance and loss of market access.

7. Respondents also argue in a footnote that to the extent the trial court relied on Padgett's testimony regarding the noise remediation, such reliance was improper because Padgett was not qualified as an expert in acoustical noise. They cite no case law for this argument. Accordingly, this argument is abandoned. See Bennett v. Inv'rs Title Ins. Co., 370 S.C. 578, 599, 635 S.E.2d 649, 660 (Ct. App. 2006) (noting when appellants fail to cite any case law for their positions and make conclusory arguments, the appellants abandon those issues on appeal). Further, Appellants did not object during Padgett's direct testimony about the soundproofing and first moved to strike his testimony regarding acoustical matters during their cross-examination. See Campbell v. Jordan, 382 S.C. 445, 453, 675 S.E.2d 801, 805 (Ct. App. 2009) (noting the failure to timely object when testimony was initially offered waives the right to argue any error in the admission of that testimony on appeal).

8. Appellants also assert the trial court misused the term of quiet enjoyment. See Enjoyment, Black's Law Dictionary (10th ed. 2014)

The trial court is vested with considerable discretion over the amount of a damages award, and our review of the amount of damages is limited to the correction of errors of law. In reviewing a damages award, we do not weigh the evidence, but determine if any evidence supports the award.

*Vortex Sports & Entm't, Inc. v. Ware*, 378 S.C. 197, 208, 662 S.E.2d 444, 450 (Ct. App. 2008) (citation omitted).

To recover damages, the evidence must enable the jury to determine the amount of damages with reasonable certainty or accuracy. However, "proof with mathematical certainty of the amount of loss or damage is not required." The determination of damages may depend to some extent on the consideration of contingent events if a reasonable basis of computation is provided, allowing a reasonably close estimate of the loss.

*Magnolia N. Prop. Owners' Ass'n v. Heritage Cmtys., Inc.*, 397 S.C. 348, 374-75, 725 S.E.2d 112, 126 (Ct. App. 2012) (citation omitted) (quoting *Whisenant v. James Island Corp.*, 277 S.C. 10, 13, 281 S.E.2d 794, 796 (1981)).

In *Magnolia North Property Owners' Ass'n*, 397 S.C. at 375 n.9, 725 S.E.2d at 127 n.9, the appellants argued an expert's estimate of hidden damage was speculative because his past experience in assessing hidden damage included some buildings with stucco siding, while the buildings in the case had Hardie Plank siding above a brick veneer. This court found "the fact that this expert's past experience with assessing hidden damages included buildings with stucco siding would go to the weight of the evidence rather than its existence." *Id.* (citing *Dep't of Transp. v. Rogers*, 44 N.C.App. 56, 259 S.E.2d 775 (1979) (holding there was no error in admitting into

---

(defining quiet enjoyment as "[t]he possession of land with the assurance that the possession will not be disturbed by a superior title"). Because Appellants did not raise this in their motion for reconsideration to the trial court, this issue is not preserved for our review. *See In re Timmerman*, 331 S.C. 455, 460, 502 S.E.2d 920, 922 (Ct. App. 1998) ("When a party receives an order that grants certain relief not previously contemplated or presented to the trial court, the aggrieved party must move, pursuant to Rule 59(e), SCRCP, to alter or amend the judgment in order to preserve the issue for appeal." (citing *Godfrey v. Heller*, 311 S.C. 516, 429 S.E.2d 859 (Ct. App. 1993) (finding when a theory of relief was first raised in the lower court's order, the appellant must challenge this theory with a Rule 59, SCRCP, motion))).

evidence the testimony of the defendant's expert regarding the value of the defendant's condemned property because the fact that the expert had not observed the property at the time of the taking went to the weight given his testimony by the jury)).

In *Pope v. Heritage Communities, Inc.*, 395 S.C. 404, 424, 717 S.E.2d 765, 776 (Ct. App. 2011), the appellants "argued the trial court erred in admitting the expert testimony because the methodology was flawed by concluding homeowners that were not permanent residents suffered loss of use damages." In that case, the expert "testified he estimated the damages for loss of use by the number of units, the size and number of bedrooms per unit, and comparable rental rates in the area. [He] included loss of use for all owners, regardless of how each owner utilized his or her unit, opining the owners were uniformly affected regardless of their use." *Id.* "Thus, according to [the expert], an owner who was a permanent resident and had to move out suffered the same loss of use damages as an owner that used the unit as a second home and could not use it." *Id.* This court found "no abuse of discretion by the trial court in admitting this testimony. In considering the evidence, the court recognized Appellants' argument to exclude the testimony was based on a belief that the damages suffered by each type of owner were different." *Id.* at 425, 717 S.E.2d at 776. "The trial court found the basis of Appellants' attack on [the expert] was the believability, rather than the admissibility, of his testimony." *Id.*

 South Carolina case law "imposes a legal duty on builders to undertake construction commensurate with industry standards." *Kennedy v. Columbia Lumber & Mfg. Co.*, 299 S.C. 335, 346, 384 S.E.2d 730, 737 (1989).

No one is entitled to absolute quiet in the enjoyment of his property; he may only insist upon a degree of quietness consistent with the standard of comfort prevailing in the locality in which he dwells. The location and surroundings must be considered, since noise which amounts to a nuisance in one locality may be entirely proper in another. The character and magnitude of the industry or business complained of and the manner in which it is conducted must also be taken into consideration, and so must the character and

volume of the noise, the time and duration of its occurrence, . . ., and all the facts and circumstances of the case.

*Strong v. Winn-Dixie Stores, Inc.*, 240 S.C. 244, 255-56, 125 S.E.2d 628, 633-34 (1962) (quoting 39 Am. Jur. 332, § 47).

■■■■■■ "As a general principle, a landowner, who is familiar with her property and its value, is allowed to give her estimate as to the value of the land and damages thereto, even though she is not an expert." *Bowers v. Bowers*, 349 S.C. 85, 92, 561 S.E.2d 610, 614 (Ct. App. 2002). For people other than the owner of real property to give their opinion as to the value of real property, it must be shown they are competent. *Rogers v. Rogers*, 280 S.C. 205, 209, 311 S.E.2d 743, 745-746 (Ct. App. 1984). "[T]he source of his knowledge must be revealed to remove his opinion from the realm of mere conjecture." *Id.* at 209, 311 S.E.2d at 746.

In this case, the trial court denied Appellants' motion to strike Padgett's testimony regarding the sound issues, finding:

[H]e testified as to what type of construction should be appropriate between floors and ceiling between apartments, not as to the sound in the apartments. Now, I'm not sure where we're—you're drawing the line between acoustical and actual what is standard in the industry in preventing some sound between apartments. I thought he testified that this is what was needed to prevent sound and normal in the industry when he testified earlier. Now you're trying to move it over to noise level.

The trial court further stated, "[W]hat's the standard in the industry? That's what the question is, not what the decibel levels are or not. I understand where you're coming from, but I don't think he testified to that, so your motion is denied."

Appellants' attack on Padgett's testimony on the sound issues because he was not an expert in acoustic noise went to the weight of Padgett's testimony, not the decision of whether to admit of that testimony.

■■■■■ The record contains evidence to support the trial court's awarding damages to Respondents to correct the noise problem. Numerous Unit Owners testified tenants moved out because of the noise or that they themselves experience noise problems that interfered with their lives. Several Unit Owners

provided that even after Appellants attempted to fix the sound problems, they continued to experience issues.

Although Appellants' expert testified alterations to the ceiling had improved the sound problems, he acknowledged further improvements could be made by working on the floors. He simply believed it was not worth the cost to do that. He also acknowledged the improvements they made only improved the airborne sound issues and not the impact sound problems. He provided the impact sound measurements for the units were not up to the standard that he normally would try to achieve. He acknowledged for the purchase price of condos, he personally would want to live somewhere with a better impact sound rating. He also indicated the result was typical for a retrofit but not the same quality as new construction would be. He also noted sound problems can never be eliminated from a wood frame building.[9] He thought it was too expensive to put in Gypcrete[10] after the fact even though it should have been used initially. He specified the problem with the sound transmitting through the floors was created by installing mats under the floors with nails, which should have never occurred. He thought the improvement in sound transmission after they made modifications was substantial "under the circumstances." He further admitted the sound remediation that was already done caused the ceiling height to be lower than it would have been if the remediation had been done another way.

Appellants stated at post-trial hearing: "It may not be perfect for everybody throughout the building, but they were consistently redone throughout all six buildings over a long period of time to great expense to [us]. We acknowledged the problem. We did not hide from it. We went in there to try to fix it." "Simply put, [Dr.] Stewart testified that there's no way

9. The record contains testimony the buildings were stick (wood) buildings instead of concrete based buildings. Willis testified multi-level condominiums would usually be built with concrete and he did not know of any other condominium project in the area at this price point that was constructed like the Oaks. He also testified apartment and condominiums are constructed differently because of cost efficiency.

10. Gypcrete is a lightweight concrete that is standard in construction if the floors are not solid concrete, even in apartment buildings. Gypcrete was not originally installed in the building here.

to redo the ceiling beyond what we have already done. There's just nothing more that they can do." "[T]here was nothing more that could be done."

■ Apart from the sound issues, one resident had a problem with his unit having chemical odors while another had issues with chemical odors following floor repairs done by the Developer. Many residents had problems with their floors warping and separating and developing mold. There were issues with leaks and plumbing causing rotting and mold. Many residents had issues with mold. There was testimony the roof leaked and was not installed properly or up to code. The railings were not primed.

■ One of the Unit Owners, Joe Chiovarou, testified at trial about costs for a hotel, storage, and movers based on estimates he had obtained on behalf of the Board, and a spreadsheet he prepared with those estimates was admitted into evidence. Respondents also argued because the Unit Owners would be staying in a hotel, they would need money for meals out because they could not cook. On cross-examination, Chiovarou testified he paid $3,500 per month for a rental house on Sullivan's Island during the winter season. But he specified that it would be difficult to find enough available and acceptable houses to rent at one time for all the Unit Owners. Padgett testified that owners would have to hire a mover and rent storage and a place to live while repairs were being made. Appellants did not present any witnesses to testify on their behalf about rental home availability or costs or alternative pricing for hotel rooms.[11] Based on this testimony, particularly in light of the fact Appellants did not present any evidence of contrary prices, the record contained evidence to support the trial court's amount for damages for these items.

## CONCLUSION

Based on the foregoing, the trial court is

**AFFIRMED.**

---

11. Although Appellants' attorney stated they had documentation showing Appellants had paid a lesser price for movers for the previous remediation, the record does not contain any such exhibit or any testimony relating to this price. Additionally, Chiovarou was not cross-examined about the previous price.

LOCKEMY, C.J., concurs.

MCDONALD, J., concurs in result only.